In the Matter of SHANTAL M. K., an Infant. GRAHAM-WIND-HAM, Appellant; DEBORAH K., Respondent.

First Department, June 26, 1979

## APPEARANCES OF COUNSEL

*Helen L. Buttenwieser* of counsel *(London & Buttenwieser,* attorneys), for appellant.

*Louis L. Frank* for respondent.

## OPINION OF THE COURT

MURPHY, P. J.

This is a permanent neglect proceeding brought under section 384-b of the Social Services Law. Paragraph (a) of subdivision 7 thereof provides: "For the purposes of this section, 'permanently neglected child' shall mean a child who is in the care of an authorized agency and whose parent or custodian has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child. In the event that the parent defaults after due notice of a proceeding to determine such neglect, such physical and financial ability of such parent may be presumed by the court."

The evidence adduced at the fact-finding hearing indicated that in the critical period, September 4, 1974 through September 29, 1975, the natural mother did not maintain any contact with or plan for the future of her first child, Shantal, although she was physically and financially able to do so. The mother maintained that the petitioner, Graham-Windham Child Care Agency, did not use diligent efforts to encourage and strengthen her parental relationship with Shantal. It was the agency's position that such efforts on its part would have been detrimental to the best interests of the child. The court below agreed with the mother and dismissed the petition. We would find otherwise.

To resolve this appeal, we must necessarily take cognizance

of Shantal's entire case history. However, we shall focus on the critical one-year period from September 4, 1974 to September 29, 1975.

Shantal was born on November 26, 1970. In December of 1970, Shantal was voluntarily placed with the agency since the mother then had no home for the child. Shantal was placed in a foster home until April of 1971 when she was returned to the mother. On a visit to Shantal, the foster mother noticed burns on her body. On October 14, 1971, Shantal was adjudged an abused child when the mother could not adequately explain the origin of the burns. Shantal has remained with the agency under subsequent orders of extension.

Shantal's natural father has been incarcerated almost continuously since her birth. Her mother has been supported by public assistance. The mother has given birth to three younger children between 1972 and 1976. Jemal, the second oldest child, has a natural father different from Shantal's. Jemal's father is also in prison. It is not evident from the record who fathered the other two children.

During the January, 1972 to December, 1973 period, the mother's contacts with Shantal were barely minimal. In the fall of 1973, the agency brought its first permanent neglect proceeding. Although Judge GARTENSTEIN denied that application on January 3, 1974, he made the following relevant remarks in the course of his decision:

"Testimony at the trial clearly elicited the fact that these criteria were not met; that in fact, the mother has been maintaining a regular course of visitation. The distinct inference is created and not dispelled that these perfunctory visits are almost legal maneuvers by the mother to forestall a finding of permanent neglect. Nevertheless, even in the face of clear evidence that the mother is far from rehabilitated on the one hand; and that the interests of the child will be served by freeing her for adoption on the other, the Court is powerless to act.

"At the very least, placement should be extended and the Court so orders. The Court, however, has no alternative but to deny the application to free Shantal for adoption. The net result of these proceedings leaves matters in limbo to everyone's detriment. And the prognosis appears to be for a repetition of this same procedure year after year without resolving the matter either way. The cost in human terms is self

evident. But in addition, there is the fact that the public treasury now spends approximately $5,000.00 annually for each child in foster-home placement. And placement is at best a tenuous stop-gap measure".

From January, 1974 to September, 1974, the mother's relationship with Shantal admittedly improved. The mother saw the child with regularity on a biweekly basis up until her visit of September 3, 1974. Thereafter, but for one court visit on June 30, 1975, the mother did not see or communicate with the child until September 30, 1975.

The mother contends that she was prevented from seeing Shantal because she entered a job training program to become a secretary in September of 1974. The mother alleges that the training program prevented her from visiting Shantal during the week and that the agency would not permit visits on weekends. Upon this record, we find that the agency made two attempts in the fall of 1974 to encourage weekend visitation in the foster home but the mother was not responsive to the agency's efforts. We also find that the agency made a further attempt in early February of 1975 to encourage the mother to visit Shantal. Although the mother was told that any visit would have to be confirmed, she presented herself at the agency without notice on February 4, 1975, a date when Shantal was unavailable.

Moreover, it should be stressed that the training program only ran from 9:00 A.M. to 3:00 P.M. The mother could have made some provision to see Shantal during the week if she wished to do so. In any event, the mother terminated her participation in the training program in April of 1975. Therefore, from April, 1975 to September, 1975, the mother had no legitimate excuse for not visiting Shantal.

From December of 1970 to February of 1975, the agency had diligently sought to encourage and foster the parental relationship. The agency caseworkers made countless visits during that time frame to counsel and assist the mother. The caseworkers referred the mother for psychiatric testing but the tests did not reveal any mental illnesses. The agency also provided the mother with a homemaker from March of 1973 to February of 1975. The agency's decision in February of 1975 to discourage further visitation in the best interests of Shantal was only made after a significant expenditure of time and money on its part to foster the parental relationship.

In addition to the mother's lack of response to the overtures

made by the agency, there was another reason for discouraging any further visitation after February of 1975. The homemaker had reported in December of 1974 that the third oldest child, *Hassan,* had burns, bruises and black eyes. Although no formal proceeding was ever brought against the mother on the basis of the homemaker's report, that report did reconfirm the agency's suspicions that the mother abused all her children. In the year-end report for 1974, the caseworker succinctly observed: "We are still evaluating this home. There was a complaint issued by homemaker of abuse toward *Haussen [sic].* This charge is being investigated by Protective Services. We feel this mother is potentially dangerous toward her children and unable to effectively meet their emotional needs. She has no concept of the children's needs for her understanding and maturity".

We find that the agency was justified in discouraging further visitation on the facts known to it in February of 1975. The agency's second petition was promptly brought in June of 1975 but was withdrawn when a key witness was not available for trial. We do not look upon the service of the second petition as an act of harassment but rather as a "good faith" and meritorious attempt to eliminate the parental rights to the child.

With some reservations, a new worker assigned to Shantal's case renewed contact with the mother in September of 1975. We do not view this renewed contact by the agency as proof that the mother had shown renewed interest in the child. Instead, the renewed contact would appear to be an improvident exercise of discretion by the agency. It would have been in the best interests of Shantal if the third petition had been brought in September of 1975 rather than in September of 1976. Despite many visits from the caseworker in the fall of 1975, the mother only chose to visit Shantal on three occasions, viz., September 30, October 21 and November 24. By the fall of 1975, Shantal had become vehemently opposed to any contact with the mother. This fact is confirmed by the caseworker's entry for November 3, 1975: "11/3/75: Telephone call to Mrs. Singleton to remind her about the following day's visit. She said that she had just reminded Shantal about it, and in response she threw a fit screaming and crying that she would not go. Shantal was reluctant to get on the phone with me but finally, pressured by Mrs. Singleton, got on the line.

She immediately started crying and would not say anything except to reply 'no' when questioned if she wanted to go. Her crying became louder and I asked if she was afraid I would not bring her back. She wailed 'yes' and then, even with reassurance from me that she would be returned to the foster home, dropped the phone and refused further discussion".

In December of 1975, the mother went to North Carolina with the three other children; she returned to New York City in February of 1976. The agency had not been told beforehand of the visit. When the mother returned, she informed the agency that Hassan was with her. However, correspondence with a North Carolina public service agency revealed that Hassan was left in North Carolina with his maternal grandmother until August of 1976. There are further indications in the record that Jemal was being left in a cousin's apartment in Bronx County for intermittent periods during 1975 and 1976. In November of 1975, the agency also filed a suspected abuse form against the mother for burns found on Jemal's body.

The catalogued events, both before and after February of 1975, strongly support but one conclusion: continued contact by Shantal with her mother would have been highly detrimental to her physical, psychological and emotional well-being and development. When the natural parent thus fails to accept the parental role, her parental rights in the child should be terminated (*Matter of Orlando F.,* 40 NY2d 103, 111).

Accordingly, the order of the Family Court, Bronx County (WINGATE, J.), entered September 25, 1978, which dismissed the petition brought pursuant to section 384-b of the Social Services Law, should be reversed, on the law and the facts, the petition should be granted and the matter should be remanded for further proceedings before a different Judge, without costs.

BIRNS, FEIN, MARKEWICH and ROSS, JJ., concur.

Order, Family Court, Bronx County, entered on Septebmer 25, 1978, reversed, on the law and the facts, the petition granted and the matter remanded for further proceedings before a different Judge, without costs and without disbursements.