■ In the Matter of LISA ANN U. and Another, Alleged to be Permanently Neglected Children. ST. LAWRENCE COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; THIRZA V., Appellant.—Appeal from an order of the Family Court of St. Lawrence County, entered June 30, 1978, which permanently terminated respondent's parental rights as to her children Lisa and Alida. This proceeding to terminate parental rights involves two of the respondent mother's four children. Lisa and Alida, now 13 and 11 years old, were voluntarily surrendered by respondent to the petitioner St. Lawrence County Department of Social Services on January 9, 1976. Initially given custody for a period of one year, petitioner instituted this proceeding to terminate respondent's parental rights on May 23, 1977 after said custody had been extended for an additional year. Following fact finding and dispositional hearings, Family Court granted the petition on the basis that Lisa and Alida were permanently neglected children and awarded custody to petitioner for purposes of adoption. This appeal ensued. Respondent's argument that the Family Court erred in finding her two children to be permanently neglected must be rejected. During the period in which Lisa and Alida were in the petitioner's care, the respondent was quite transient, continually moving without leaving a forwarding address. Whenever respondent did contact petitioner, visits were arranged with her children. Petitioner found respondent a place to live in St. Lawrence County so she could be close to her children. Respondent, however, chose to move 300 miles away to Orange County and later moved to Florida before returning to New York State. Service plans were formulated by petitioner to guide respondent in stabilizing her living arrangements so that the children could be returned to her. While it may have been possible for petitioner to have done more to encourage and strengthen the parental relationship, "we must not become enmeshed in an analysis of the niceties of the precise degree of required diligence of effort" *(Matter of Joyce A. R.,* 52 AD2d 882). Petitioner's efforts were adapted to the particular circumstances *(Matter of Karas,* 59 AD2d 1022, mot for lv to app den 43 NY2d 646) and adequate to fulfill its statutory duty (Family Ct Act, § 614, subd 1, par [c]; Social Services Law, § 384-b, subd 7, pars [a], [f]). The finding by Family Court that respondent failed to plan for the future of Lisa and Alida (Family Ct Act, § 614, subd 1, par [d]; Social Services Law, § 384-b, subd 7, pars [a], [c]) must also be upheld in view of respondent's failure to effectuate any feasible and realistic plan

for her children *(Matter of Orlando F.,* 40 NY2d 103, 110). There remains one final issue raised by respondent which requires our attention. Petitioner offered into evidence at the fact-finding hearing its entire case file on respondent and her children. In support of her contention that such an admission was reversible error, respondent relies on the recent case of *Matter of Leon RR* (48 NY2d 117)· wherein the Court of Appeals stated *(supra,* p 124) that "the admission of the entire case file, standing alone, is sufficient to warrant reversal". A closer examination of the court's reasoning in *Leon RR,* however, compels us to disagree with respondent's interpretation of that case's holding. *Leon RR* did not say that a Family Court committed reversible error every time it allowed an entire case file to be admitted into evidence. Rather, the court in *Leon RR* pointed out that the entire case file could not be admitted under the business record exception to the hearsay rule (CPLR 4518, subd [a]) and outlined the procedure under which such a file could be admitted. "The better practice would have been for petitioner to have given respondents notice and an opportunity to examine the file prior to the hearing * * * As a matter of fundamental fairness, then, before such a massive document is sought to be introduced into evidence, the proponent, normally as a matter of good practice, should give his adversary notice of that intention sufficiently far in advance of trial to allow the opponent an opportunity to investigate * * * If notice is not given, upon timely application the court, in its discretion, may properly grant a reasonable continuance so that the opponent may at least acquaint himself with the contents of the document" *(Matter of Leon RR, supra,* pp 123-124). Thus, because the respondents in *Leon RR* were not given an opportunity to review the case record admitted into evidence, "fundamental fairness" was violated in that they were effectively denied their right to introduce evidence to rebut the statements contained in the file *(Matter of Leon RR, supra,* p 123). In the instant case, when petitioner offered the case record into evidence on December 19, 1977, the first day of trial, respondent's counsel requested an extension in order to review the record's contents. Family Court admitted the file subject to respondent's right to make written objections to any portion of the record at a later time. Respondent's counsel was allowed to inspect the case record during that day's lunch recess. The following day, respondent's counsel complained that due to the limited time offered to review the file and the numerous hearsay statements contained therein, it was impossible to reduce all of his objections to writing. Counsel then moved that petitioner be required to remove from the file any materials which it sought to introduce and offer the evidence item by item. Family Court denied the motion and reiterated its position that counsel could study the case record at the conclusion of the evidence and submit a list of those portions which he felt were prejudicial. Furthermore, respondent's counsel was assured that he could request the taking of testimony to rebut any material in the case record. After further discussion with counsel concerning the presence of anonymous and vindictive letters in the file, Family Court ordered that all letters other than those from respondent or petitioner's employees be removed from the record. The fact-finding hearing was then adjourned until January 23, 1978, during which time the case record was made available for review by respondent's counsel. Before adjourning, the court made it clear that both sides would have to be prepared to present any other witnesses they wished to call when the hearing resumed on January 23, 1978. When the fact-finding hearing concluded on January 30, 1978, respondent's counsel had still not made any specific objections to material in the case record despite having had over 40

days to review the file. It is significant to note that any attempt by respondent's counsel to object to material in the file or offer rebuttal testimony, even as late as January 30, 1978, would have been effective in view of the Family Court Judge's statement on that date that he had still not read the case record. We, therefore, conclude that the admission of petitioner's entire case file on respondent and her children in this proceeding to terminate parental rights complied with the principle of "fundamental fairness" as defined by the Court of Appeals in *Matter of Leon RR (supra)*. Accordingly, the order of Family Court must be affirmed. Order affirmed, without costs. Mahoney, P. J., Greenblott, Main and Casey, JJ., concur.

Herlihy, J., dissents and votes to reverse in the following memorandum. Herlihy, J. (dissenting). As I view the instant record limited to the fact-finding hearing, it is apparent that, as a matter of law, the motions of the appellant for a dismissal of the proceedings for a failure of proof should have been granted at the closing of the petitioner's case. It is well established that the St. Lawrence County Department of Social Welfare (Department) was properly acting in the best interests of all of the appellant's children when it first became involved with this family in September of 1974 and when it accepted the custody *voluntarily* granted by the appellant on January 9, 1976. However, those matters were not ones properly at issue herein on the fact-finding hearing, the question being the conduct of the appellant *and* the conduct of the Department on and after January 9, 1976. As noted by the majority, the appellant had four children (all girls) all of whom were voluntarily placed by the mother with the Department. At the time of the Family Court decision (February 3, 1968) the youngest child was 9 (plus 8 months) and the others were 11 (plus 4 months), 12 (plus 11 months) and 14 (plus 11 months). The circumstances of the girls never varied one from the other as to their relationship with the mother and/or the need for custody in the petitioner. Nevertheless, the Department never sought a permanent termination of parental rights as to the older two girls and the appellant finally had their custody returned to her on April 18, 1979 at their then ages of 14 and 16. At the time of the surrender of the children to the Department the family unit consisted of appellant, her husband Clifford W. and the four girls, residing on a dairy farm owned by Clifford W. The Department's case file, which was admitted into this record *in toto* over the objection of appellant's counsel, as well as the testimony of one Betty Buehler (a Department caseworker), admitted over the objection of appellant's counsel, establish that Clifford W. suffered a debilitating shock in July of 1974 and, as a result, could no longer perform farm chores or any labor. The appellant tried to be mother, wife, nurse and farmer, with the result that the house and the girls became filthy and the harbingers of foul odors. To describe household conditions as unsanitary during the two visits of Buehler in the months of March and April of 1975 is perhaps too generous a term for absolute squalidity. It should be observed that *prior* to these visits by Buehler, the appellant and Clifford W. had come to Buehler's office in February of 1975 seeking financial assistance, but they were denied financial aid. Buehler also testified on cross-examination that the mother had no help at all in her home and was unable to secure any help. Nevertheless, when Buehler visited the household on June 16, 1975 the house was all cleaned up. Prior to the offer and receipt of Buehler's testimony, the separate counsel representing the appellant and Clifford W. had conclusively established through the cross-examination of the caseworker, Emily Skiff (also named in caseworker's log as Emily Cummins),

that the Department had at no time throughout the period of its custody made any *effort,* much less diligent effort, to assist the family unit to establish the physical facilities necessary to function as a unit. As a matter of fact, the testimony of Skiff, as well as documents euphemistically described as service plans and dated May 5 and July 13, 1976 require the mother, as "treatment", to obtain a divorce from Clifford W. Indeed, the initial adjudicatory court order following the voluntary surrender by the appellant and dated March 5, 1975, provides, in part: "3. That the mother [appellant] shall not have resumed living with her husband [Clifford W.] if the children are to be returned as provided." Regardless of any personal opinions that the Family Court Judge or any members of the Department might have had as to Clifford W. and his probable future marital relations with appellant, such surgery of the family unit is contrary to express findings of the Legislature, contained in section 384-b (subd 1, par [a]) of the Social Services Law, which provides, in part, as follows: "(iii) the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home". The diligent efforts of the Department must be weighed against this absolute restriction which of necessity left the appellant entirely on her own wits for support, without any housing which would be adequate for her and the children no matter how clean, and without benefit of emotional support in St. Lawrence County. The response of the Department to the appellant's plight was to place her in an "adult" boarding house at county expense, located some distance from the foster homes of her children, and to provide her with transportation to visit the girls, as she had no other transportation available. No one pretends that there was any employment available for the mother in the vicinity of the boarding house and, in any event, the Department made no effort to assist her in finding employment or rental of adequate housing for herself and the children during the period of about three weeks that she resided in the house. The mother left the boarding house on March 22, 1976, as she had previously advised Skiff she intended to do. It should be noted that Skiff made no adverse comments on the mother's cleanliness or courtesy to her throughout the extensive period of her contacts with the appellant. However, Skiff complained that the appellant did not give her a forwarding address when she left and her whereabouts were unknown to the Department until April 26, 1976, when she telephoned and requested visitation. As to the whereabouts of the mother, the record contains the testimony of the foster mother of the two oldest girls, and she testified that the girls received letters from the appellant on April 5, 1976. Further, the appellant telephoned the girls on April 17, 1976. The caseworker's log shows that Skiff was advised of the letter in April, soon after its receipt at the foster home residence, and that Skiff visited the girls soon thereafter and conversed with the girls. In any event, the caseworker's log shows that when the appellant advised Skiff she intended to leave "It was decided that [appellant] will contact worker [Skiff] when she got settled downstate." The majority notes that the appellant "was quite transient, continually moving without a forwarding address." The record establishes that the mother, from March 23, 1976 until March 15, 1977, lived at various addresses in Orange County with the exception of about three weeks in September of 1976 when she was in jail in St. Lawrence County upon an old charge. Skiff testified that the longest period of time of no current address was March 23, 1976 to April 26, 1976. The record reveals that from April 26, 1976 through March 12, 1977, the appellant had regular contact with Skiff and/or the Department through

telephone calls for visitation with the two oldest children. Further, in addition to those contacts and her *actual* visitation with the oldest girls, she also wrote and/or telephoned those girls. I do not recognize any basis whereby it could be reasonably said that the petitioner proved by a fair preponderance of the evidence that the mother continually failed to arrange for the forwarding of her mail and/or contacts. It would seem reasonable to note at this point that the Department file contains observations that Clifford W. was trying to trace the whereabouts of the appellant and was quite correctly accusing the Department and/or Skiff of interfering with his marriage. To the extent that the Department and the Family Court were manipulating the appellant's marital relationship as a "condition" of returning her children to her, the same governmental agencies must accept some responsibility for her footloose life style. There is some concrete evidence that the mother did in fact attempt to secure housing which would be sufficiently large and adequate for herself and the four girls. Indeed, she did at one point have some housing, and a representative of the Orange County Department of Social Services (Orange County) wrote the Department on August 30, 1976 that they had visited the proposed home. Orange County reported nothing wrong with the home, but instead took the tack that appellant should have counselling because "she needs some help emotionally although she appears to be physically and financially capable of caring for her children with the help of Public Assistance." At this point, the relationship of Orange County and the Department should be considered because the sole responsibility of Orange County was to inspect the home for the Department. Orange County had no jurisdiction over the children and in view of the personal contacts of appellant with the Department, there is no showing of necessity or jurisdiction for Orange County injecting its caseworker's impression of the appellant as a person. Orange County had no more direct contact with the appellant, but on January 13, 1977 it further wrote to the Department giving its opinion that the mother should not have her children without "personal counselling." As against the Orange County letters to the Department, the Department file contains a full report and evaluation done by the St. Lawrence County Mental Health Clinic, dated March 3, 1976 and submitted to by the appellant pursuant to the directions of the Family Court and the Department. The March 3, 1976 report did not recommend any further contacts with the clinic. In any event, the record does not disclose any failure on the part of the appellant to co-operate with the Department. To expect the appellant to obtain a suitable residence when she is receiving only welfare assistance of about $95 per month is somewhat astonishing. To further blame her for failure when she does secure some form of housing but cannot have it approved because she needs "personal counselling" borders on the ridiculous. It is interesting to note that Orange County reported in its letter of August 30, 1976 "that her husband is looking for her, and upon occasions she has had to hide in the bushes to avoid seeing him when he has come to her home." It is little wonder that appellant might seem nervous at times and, of course, the Department knew at all times that Clifford W. was opposed to having appellant separated from him. It would be remiss not to comment upon a finding of the Family Court that the appellant did not appear at a scheduled hearing of March 1, 1977 and "claimed not to have received notice although notice was sent to her last known address." The hearing was in regard to a petition filed by the caseworker (Skiff) of January 24, 1977 and it gave appellant's address as being one in Montgomery, New York. The caseworker's log shows that on January 7, 1977 the appellant advised Skiff that she

was no longer living at the Montgomery address and was residing with a named friend in Newburgh and could be reached at a stated telephone number. Further, the log and Skiff's own testimony in the case reveal that on January 13, 1977 the appellant and Skiff were in each other's company for an extended period of time and Skiff raised no further question as to the sufficiency of the address given her. The caseworker's log contains a further entry on March 1, 1977, wherein Skiff notes that she inadvertently gave the court the wrong address. Indeed, *records of the Family Court* show an entry dated March 15, 1977 which notes that the appellant was entitled to a rehearing or rescheduling, but nevertheless the court decided to continue the marking of the case as "closed". In any event, the finding of the Family Court which implies a failure to keep the court and/or the Department advised is erroneous and is a misstatement of its own records. It should be further observed that the original records and petitions filed in this case leave substantial doubt as to the propriety of the procedure adopted and orders entered prior to the fact-finding hearing on the petition seeking to terminate parental rights. In particular, the Family Court record reveals that although the mother was entitled to proper notice of the March 1, 1977 hearing and did not receive it, the court, after determining that she was entitled to a hearing, continued the case closed and *did not* schedule a new hearing as was required for due process purposes. Further, the original record reveals that although there were no findings of neglect, the court on June 17, 1975, entered an order which did not grant custody to the Department, but purported to be an order of disposition releasing all four children "to the care of their parents under the supervision of the Department * * * for a period of one year". Thereafter, the mother voluntarily surrendered custody to the Department by a contractual agreement, pursuant to section 384 of the Social Services Law, on January 13, 1976. Instead of promptly filing the petition for approval of the contract as permitted by section 384 of the Social Services Law, the Department, on January 14, 1976, petitioned for a modification of the prior June 20, 1975 order by granting custody to the Department for placement in foster care. Next, the Department, on February 9, 1976, duly petitioned for approval of the contract and foster care. The petitions for modification of the June order were initially scheduled for hearing on January 23, 1976, but were subsequently adjourned to February 9, 1976 when the petitions for approval of the surrender agreements were initially scheduled for hearing. At the hearing of February 9, 1976, the court entered an order which did not specify which petitions it was entered upon, but gave custody to the Department and ordered the parents to be evaluated at the St. Lawrence County Mental Health Clinic and adjourned the proceeding to March 5, 1976. The court's notes for February 9, 1976 indicate that the order was intended to be a temporary grant of custody to the Department. On March 5, 1976 the court notes indicate that the parties agreed to terms and conditions and settled "the issue presented by the various petitions with modifications of the previous order of disposition [June 5, 1975]." The record submitted upon the appeal does not contain any transcript of the February or March, 1976 proceedings, and it does not appear that there was any procedural basis for proceeding with a dispositional order without any fact finding. Section 1051 of the Family Court Act requires findings of neglect, in cases such as the instant matter, as a foundation for final orders of disposition. Regardless of the procedural complexities which tend to mask and confuse the issue properly before Family Court at the various junctures of the important events involving the family unit, the Department and the

appellant, the present proceeding, insofar as the appellant is concerned, is premised upon a petition seeking to permanently terminate the parental rights to the youngest girls. Adverting to the merits of this case, section 624 of the Family Court Act, as in effect on May 23, 1977, when the petition herein was filed, specifically prohibited evidence "of parental contact or of failure to maintain contact with a child" subsequent to the date of the filing of the petition on the fact-finding hearing. Nevertheless, the Family Court relied upon what it considered to be a lack of sufficient contact following May 23, 1977. The majority makes no comment upon this abuse by the Family Court in regard to the evidence it admitted over proper objections. The mother's failure to plan, as found by the Family Court and the majority herein, cannot reasonably be weighed without also considering the failure of any practical help from the Department. It is undisputed that the mother did at one point secure adequate housing, but had to surrender it and, in any event, she could not receive adequate assistance either in the form of support or employment to pay for adequate housing. The final element of the case requiring consideration is the introduction in evidence of the entire case file of the Department and its immediate receipt by the court. The record was introduced in evidence at the hearing of December 19, 1977, and when counsel objected to it and requested an extension to review it, the court promptly received it, stating "reserve to counsel privilege of advising the court in writing as to what portions if any they wish to object to in the case record." The court then recessed for lunch with the suggestion that during the noon hour counsel might review the Department record. Such a suggestion must be considered with the fact that the dictated notes of the caseworkers cover 113 pages of single spaced typing and there are at least 250 additional pages of "documents" on a single page estimation basis. The suggested review could only be nominal and totally inadequate for advocacy purposes and/or to determine what portions were objectionable (Matter of Leon RR, 48 NY2d 117). Parenthetically, it should be noted that on the framework in this dissent more than 30 hours were required to review and assimilate the files. The primary witness of the petitioner as to the appellant's lack of planning and/or contact with the children was caseworker Skiff, who had handled the family on behalf of petitioner since the voluntary surrender of the children by the appellant in January of 1976. The witness made continual references to the Department file to refresh her recollection and counsel for appellant objected to such use of the file, stating "it is difficult * * * to grasp everything in that record and in fact I have a motion addressed to the record". Reference was made during the testimony of Skiff to various documents in the Department file without any opportunity for *voir dire* or any effort to put such matters independently in evidence; the court observed in response to an objection of counsel for appellant: "It's part of the case record, should be returned to the case record. Let's move on, please." At another point while Skiff was testifying as to a communication which was utter hearsay and which is also contained in the caseworker's log as part of the Department file, counsel for appellant objected and the court overruled the objection. Counsel for appellant renewed his objections to the Department file during the examination of Skiff on the subsequent day of trial, pointing out to the court that in the limited review possible of the file, he discovered anonymous letters and opinions of caseworkers, and he stated that "there is no way * * * to reduce objections to writing * * * because each paragraph there is an objection". Counsel specified that it was to the wholesale entry in evidence of the file that he was objecting. The court denied the objection and/or motion to strike and

reserved to counsel the right to submit a list of objectionable portions at the end of the case and even to reopen the case for rebuttal testimony. Assuming for present purposes that the opinion in the case of *Matter of Leon RR* (48 NY2d 117, *supra)* would sanction the procedure adopted by the Family Court in this case as to the offer of the Department file in evidence, insofar as hearsay is concerned, the file in this case is objectionable because it contains a great deal of irrelevent material which is prejudicial to the appellant and which, under no circumstances, would be prima facie admissible as part of a business record, pursuant to section 624 of the Family Court Act. The sole issue involved on the fact-finding hearing was the conduct of the appellant and Clifford W. from January 9, 1976 and as to contact with the children through May 23, 1977. The file has a caseworker's log commencing September 24, 1974 and ending December 16, 1977. The documents in the file commence in September of 1974 and run through at least September of 1977.* It might be noted that the Family Court's original record, which apparently was relied on by it, also contains derogatory hearsay information entered by the clerk of the court on March 15, 1977. Major portions of the Department file were not admissible in evidence in this case, and the admission in evidence over the objection of counsel was not authorized by section 624 of the Family Court Act or by the instructions of the Court of Appeals in *Matter of Leon RR (supra).* There are further observations taken from the record which should be noted: (1) the court directed the Law Guardian to make his report, but there is no such report in this record; (2) it does not appear from the record that the court talked with any of the children, albeit Lisa stated she wished to return home to her mother. Why a distinction should have been made as to the placement of the four children remains unclear from this record. Certainly the difference in ages should not be a factor. I am in complete agreement with the court's finding that the older children should remain in placement care for a reasonable period of time, and it seems to me the same provision should have been made as to the younger children instead of the provision that they were subject to adoption *if* suitable arrangements could be made to place them together, otherwise this matter should be remitted back to the court. It is now nearly two years from the making of the order and in view of the mother's remarriage to a man who "greatly impressed" the court, the matter should be remitted to determine if the mother is a suitable person to have custody of all of her children. In retrospect, it would appear that the court should have held the matter in abeyance for a reasonable period of time to make such determination. These are troublesome and difficult cases, not only for the social services agency and the Family Court, but for appellate courts, and what this court said several years ago is worth repeating in the present instance: "I would caution that the section itself [Family Ct Act, § 611] is extremely harsh and seems contrary to human instincts and should only be implemented under the most stringent circumstances." *(Matter of Peter John DD,* 48 AD2d 956 [Herlihy, P. J., concurring].) The order directing adoption should be reversed and the matter remitted to the Family Court for further consideration of the welfare of the two children involved herein, who are at the present time, respectively, 13 and 11 years of age.

---

* It is not the intent or purpose of this dissent to criticize the Social Services Department of St. Lawrence County, recognizing, of course, that it is the obligation of these workers to place in the files any information that may come to their attention. Whether it be hearsay, information and belief, prejudicial or otherwise irrelevant, is for the court to determine.