OPINION OF THE COURT
Nanette Dembitz, J.
This proceeding was initiated by the foster parents of 11-year-old Marilyn, to terminate her biological mother’s rights in accordance with the Family Court Act and the Social Services Law, and to transfer her guardianship to them so that they can adopt her. Marilyn has lived with her foster parents under the supervision of a child care agency since she was 12 days old, and according to her guardian ad litem strongly desires her adoption; the case presents difficult and somewhat novel issues as to the balance between children’s rights and parental rights.
After two years of preliminary and pretrial proceedings before other Judges of this court,[1] a “fact-finding hearing” has now been held, as provided in article 6 of the Family Court Act, to determine the threshold question posed by the foster parents’ petition: whether the evidence establishes that Marilyn has been “permanently neglected”, within the statutory meaning of that term, by her natural mother, the respondent. This issue is crucial in a contest between foster parents and natural parent under the Family Court Act, because it is only after a finding of “permanent neglect” that the court is statutorily authorized to determine whether adoption is in the child’s “best interests”. (Family Ct Act, §§ 622, 623, 625, subd [a]; § 631.)
*974 The guardian ad litem for Marilyn supports petitioners’ allegations as to respondent’s acts of “permanent neglect”, and also argues that the child’s best interest, including her purported desire for adoption by the foster parents, constitutionally demands consideration in the instant fact-finding stage of this proceeding, rather than only in the event of a possible subsequent stage contingent on neglect finding against the mother. Respondent mother is joined in her defense by the intervenor New York City Department of Social Services, which exercises over-all authority over foster care for New York City children, as well as the intervenor foster care agency with which the department contracted for social casework services in connection with Marilyn’s foster care. The agency also argues that this court lacks jurisdiction because Marilyn’s alleged natural father was not served herein, and it raises the constitutional point that respondent cannot be deprived of her child because she is a fit parent. Whether the constitutional guarantee of due process requires a higher standard of proof of “permanent neglect” than the “fair preponderance of the evidence” provided in the Family Court Act, will also be considered.[2]
A. COURT’S JURISDICTION DESPITE FAILURE TO SERVE ALLEGED FATHER
The foster care agency argues for dismissal of the petition on the ground that the court lacks jurisdiction to grant petitioners’ prayer for the guardianship of Marilyn for the purpose of adopting her, because a Mr. D, whom respondent named as Marilyn’s unwed father, has not been served. Such service, in this court’s opinion, was not and is not required, since the mere naming of the father of an out-of-wedlock child does not make him a necessary party to an action relating to her adoption.
Responsive to the series of Supreme Court decisions from 1971 to 1979 on the rights of unwed fathers,[3] provisions *975 were added to the New York Social Services Law and Domestic Relations Law concerning the rights of fathers who have had specified associations with their out-of-wedlock children, in proceedings relating to their adoption. The issue raised by intervenor agency as to notice to a named unwed father of proceedings to terminate parental rights, is a question of first impression and of general importance to child welfare and court administration. For, out of caution born of the residual uncertainties from the Supreme Court opinions, adoptions have been handicapped and delayed -while searches have been made to find and serve a named father although he has (as shown below in the instant case) established no identification or relationship with his alleged child and has long since disappeared.
To answer the procedural question as to the need to serve Mr. D and similarly situated males, we must first consider the substantive rights of unwed fathers. Section 384-c of the Social Services Law (eff 1977) provides for notice to an unwed father of a permanent neglect or other proceeding to transfer guardianship for purpose of adoption, if his name was recorded on the subject child’s birth certificate, or he has been identified by the mother in a sworn written statement or he has identified himself or been identified in other specified respects. However, such fathers have under section 384-c only the right to appear in a dispositional or best interests hearing; there is no explicit provision as to the right of an unwed father to be heard in the instant fact-finding stage of a guardianship proceeding. The legislative intention in that respect must be inferred by construing the Social Services Law’s guardianship provisions in the light of the amendment of section 111 of the Domestic Relations Law as to the right of an unwed father to veto his child’s adoption.[4]
Amended section 111 provides that the consent of the father of an out-of-wedlock child is required as well as the consent of the mother, if he has maintained contact with the child in specified ways. However, there was no change in the pre-existing provisions that no parental con *976 sent is required for the adoption of a child for whom “a guardian has been appointed” in transfer of guardianship proceedings (Domestic Relations Law, § 111, subd 2, par [c]), and that guardianship can be transferred for purpose of adoption of “a permanently neglected child.” (Social Services Law, § 384-b, subd 4, par [d].) While the Social Services Law does not mention whether or when an unwed father is a necessary party in a permanent neglect proceeding, in applying such law the unwed father amendment of the Domestic Relations Law clearly must be respected. Accordingly, a guardian cannot be appointed under the Social Services Law for the purpose of a child’s adoption unless a successful permanent neglect proceeding or other proceeding to terminate parental rights has been brought against an unwed father whose consent to the adoption is required under the amendment to section 111 of the Domestic Relations Law.
The issue then is whether Mr. D (assuming him to be a living person) is a necessary party respondent in the instant proceeding because of the consent provisions of the Domestic Relations Law. To summarize the facts before adverting to the procedural principles, it is entirely and completely clear that he has not supported or maintained contact with Marilyn in the manner specified in such provisions or in any fashion. While the issues in this case are hotly contested, in none of the evidence offered by any of the parties as to Marilyn’s life is there any room for, or any possibility or hint of, any contact or attempted contact by Mr. D, nor can any of the evidence be deemed self-serving in this respect since paternal interest was never in any way in question. Indeed, there is more reason to credit respondent mother’s testimony that Mr. D has had no contact with her or Marilyn since the child’s birth than her statement that he was the father. Even if Caban v Mohammed (441 US 380, supra) were viewed as guaranteeing a right to an unwed father regarding his child’s adoption on a somewhat more flexible basis than the criteria provided in section 111 of the Domestic Relations Law, the result here would be the same. For Mr. D would fail to have any right with regard to Marilyn under even the most minimal standard of relationship.
*977 To restate, then, the question posed by the intervenor agency as to service on the putative father: when it is established with complete clarity that a man is outside the classes of unwed fathers with a right to be heard, must he nevertheless be joined and served as a necessary party merely because the mother has named him? It would be a procedural anomaly, as will be shown below, to do so (and dismiss the instant proceeding or delay an order with respect to respondent mother until a separate proceeding is concluded against. Mr. D). It is true, of course, that his status has herein been appraised ex parte, but that type of an appraisal is customary in determining the necessity for joinder or service.
CPLR 1001 provides: “Persons * * * who might be inequitably affected by a judgment in the action shall be made plaintiffs or defendants.” Under this rule the court has the duty to determine whether a judgment in an action “will adversely affect the rights of nonparties” (Matter of Castaways Motel v Schuyler, 24 NY2d 120, 125) or whether the “rights of respondents are * * * interwoven with the rights” of nonparties (Matter of Greenspan v O’Rourke, 27 NY2d 846) so that the action should be dismissed or the nonparty joined and served.[5] And in a leading decision under the counterpart Federal rule (Federal Rules of Civil Procedure, rule 19) the Supreme Court stated that the courts have a duty to consider whether the judgment may “ ‘as a practical matter’ ” affect a nonparty’s interest and to examine “the actual interest of the non joined person.” (Provident Bank v Patterson, 390 US 102, 110, 122.) Indeed, the unwed father amendments themselves appear to contemplate an ex parte determination of the characteristics of named fathers for the purpose of service; for, as pointed out above, fathers with specified minimal connection with the child are entitled only to notice of the dispositional hearing and those with greater connections are entitled to joinder and service as respondents for the entire termination proceedings.
*978 The basic due process issue is “the risk of an erroneous deprivation of such interest [a protected interest] through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the * * * burdens that the additional * * * procedural requirement would entail.” (Mathews v Eldridge, 424 US 319, 335.) To insure due process with regard to an interest as fundamental as parental rights, it is clear that a named father should be served if the known facts or gaps in knowledge show even a slight likelihood that he has a right to be heard in a proceeding to transfer a child’s guardianship for purpose of adoption. Here, however, the likelihood of Mr. D’s deprivation of a statutory or constitutional right through a failure to serve him is nil, and the burdens of requiring service are considerable in terms of additional expense and delay in the adoption process.[6] Though there has been over the past decade of attention to the unwed father a practice of searching for and attempting to serve any named father, it is clearly unsupported by procedural principle and must be labeled wastefully and unjustifiably overcautious. Accordingly, this court has jurisdiction herein despite petitioner’s failure to serve Mr. D.
B. CONSTITUTIONALLY REQUIRED DEGREE OF PROOF OF PERMANENT NEGLECT
While section 622 of the Family Court Act provides that “a fair preponderance of the evidence” suffices for a fact finding of permanent neglect, the constitutional guarantee of due process appears to require a greater quantum of evidence for such a finding.
Even in a case of transitory neglect, which can under the Family Court Act result only in temporary rather than permanent transfer of a child’s custody and control (see Family Ct Act, art 10), a parent has so “fundamental an *979 interest and right” that he is if indigent entitled to assigned counsel. (Matter of Ella B., 30 NY2d 352, 356.) That holding must be viewed as an emphatic expression of the importance of procedural protection for a respondent confronting any possible loss of her child’s custody, for the court has otherwise only recognized a right to assigned counsel in criminal or quasi-criminal proceedings and in habeas corpus litigation brought by patients committed for mental illness.[7]
Considering the parental loss at issue in a permanent neglect proceeding compared to that in Matter of Ella B. (supra), a parent’s constitutional right to a relationship with his child appears to require the protection of a higher standard of proof in such a proceeding than that in the ordinary civil case. Parental rights are “[r]ights far more precious * * * than property rights” (May v Anderson, 345 US 528, 533); and the standard of proof, as the court pointed out in Addington v Texas (441 US 418, 423), “serves to * * * indicate the relative importance attached to the ultimate decision.” And the court’s reasoning there (in a case of commitment for mental illness) that due process required a higher standard of proof than the customary civil preponderance test (supra, p 427) seems applicable here.
Addington’s logic in refusing to adopt the “reasonable doubt” standard and instead requiring “clear and convincing” proof (supra, p 428), likewise seems apposite in a permanent neglect case. The only step in the Supreme Court’s exposition which calls for translation into terms of the instant proceeding is its point that in mental illness commitments the “reasonable doubt standard * * * may impose a burden the state cannot meet” and thus block needed treatment (supra, p 432). Here that standard might similarly frustrate the child welfare purpose of the permanent neglect statute. For example, a permanent neglect proceeding can be based on a parental failure to plan for the child’s care in the sense of a failure “ ‘to formulate, and act to accomplish, a feasible and realistic plan’ ” (see Matter of Orlando F., 40 NY2d 103, 110, 111); and proof beyond a *980 reasonable doubt of all the elements in that definition of permanent neglect would often be an impracticable and unreasonable burden.
In sum, it is concluded that the constitutional guarantee of due process requires the application herein of the “clear and convincing” standard; and principles of statutory construction dictate the reading of such standard of proof into the act.[8]
C. GROUNDS FOR FINDING OF PERMANENT NEGLECT
On the basis of clear and convincing evidence, as outlined below and further stated in findings filed with this opinion, “permanent neglect” is found in that respondent “failed * * * substantially and continuously * * * to maintain contact” with Marilyn for over a year of her foster care, and in that the subsidiary conditions for such a finding have also been established. (See Family Ct Act, § 611; Social Services Law, § 384-b, subd 7, par [a].) However, the court must reject the petitioners’ and the guardian ad litem’s arguments that respondent’s failure to plan for Marilyn’s discharge to her from foster care from 1969 to 1977 (see Family Ct Act, § 611; Social Services Law, § 384-b, subd 7, par [a]; and see Matter of Orlando F., supra) can be held against her in this proceeding. Respondent’s articulated excuse for her failure to care for Marilyn for almost eight years, was that she first wanted to finish her nursing education and become self-supporting. Though she has not achieved this purported goal and though the evidence indicates that she was merely procrastinating from year to year for various emotional reasons, the Foster Care Review Part of this court in 1974 apparently joined the foster care agency in accepting respondent’s rationalizations.[9] With such implicit approval of respondent’s avoidance of paren *981 tal responsibility for Marilyn’s care, a finding against her on that basis would be unfair.
1. Failure to Maintain Contact
Respondent gave birth to Marilyn in 1969 when she was 16 and herself in a foster home; the infant went directly from the hospital of delivery to the home of petitioner foster parents, Mr. and Mrs. R. The R’s developed a loving, nurturing bond with Marilyn and at the same time a cordial relationship with respondent; when they moved to South Carolina in 1972, respondent was pleased to have Marilyn move with them. From 1972 to August, 1975 respondent visited Marilyn at the R’s in South Carolina, her then paramour driving respondent back and forth between New York and South Carolina and staying at the Rs’ home with her for a week or more at a time. After August, 1975, respondent did not have or seek another visit with Marilyn until April, 1977, when respondent asked the foster care agency to arrange for Marilyn’s discharge to her from foster care. The agency worker suggested that they reestablish contact, and the first of resumed visits occurred in July, 1977. The agency arranged and wholly financed that and subsequent visits.
2. Respondent’s Financial Capability
Respondent invokes the statutory justification of financial inability (Family Ct Act, § 611; Social Services Law, § 384-b, subd 7, par [a]) as the reason for her failure to visit Marilyn for over a year and a half. She emphasizes the breakup sometime after August, 1975 of her relationship with her paramour who had supplied transportation, as well as her unemployment, and claims she was ignorant of the agency’s willingness to finance her visits. However, in view of the agency’s counseling work with respondent over many years, and its constant goal of helping her maintain her parental relationship, it is clear that respondent would have mentioned the financial problem to the agency if she had in fact wanted to visit her child. See Blum v Fresh Grown Preserve Corp. (292 NY 241, 246) and Bernstein v Berman (39 AD2d 525), as to incredibility of testimony as *982 matter of law despite the lack of contradiction.[10] And it is likewise clear from the agency’s conduct that the assistance it gave respondent in 1977 would have been forthcoming at any time that she had indicated a desire for it.
Respondent was therefore “financially able” to visit Marilyn in the sense intended by the statute. The availability of public funds constitutes financial capability from the standpoint of “permanent neglect” (see Matter of Karas, 59 AD2d 1022, lv to app den 43 NY2d 646), because the purpose of the financial ability clause is to preclude a permanent neglect finding only when the parent’s failure to maintain contact is attributable to external impossibility (see discussion of reasons for parental failure in Matter of Shantal M.K., 68 AD2d 482, 485). While respondent apparently felt that her visits to Marilyn after August, 1975 would have been less enjoyable, in part because of her breakup with her paramour and the Rs’ possible decreased cordiality, such a loss of tangential satisfactions cannot be deemed an excuse for respondent’s failure to maintain visits with her child in view of the purpose óf the permanent neglect statute; such a motivation for an abandonment of contact indicates the low priority given the child’s needs in the parent’s constellation of interests.
3. Agency Efforts to Strengthen Parental Relationship
The foster care agency persistently maintained regular and continuing casework and counseling contact with respondent; their conferences did not, however, include the arrangement of visits. Both before and after the R’s moved to South Carolina in 1972, respondent arranged directly with Mrs. R for visits with Marilyn in the Rs’ home. In view of the evidence of respondent’s dislike of coming to the agency office, this arrangement undoubtedly was more agreeable to her than visits scheduled and supervised by an agency worker, in accordance with the more customary procedure in foster care cases. The question then is whether agency “efforts to encourage and strengthen the parental *983 relationship”, as required by the Family Court Act (Family Ct Act, § 611; Social Services Law, 384-b, subd 7, par [a]), should have included agency inquiry into respondent’s contact with Marilyn in the period from September, 1975 to April, 1977 and agency efforts to impel respondent towards visitation; such agency conduct has not been proved.
The evidence including the testimony of the agency witness called by respondent, attests to its good faith goal of encouraging respondent’s relationship with Marilyn. The record also reflects the view of the agency workers that they should tread cautiously in their counseling efforts because of respondent’s serious psychological problems, interwoven with her reluctance to speak of Marilyn and her focus on personal objectives. (The agency had referred respondent for psychiatric treatment, but she had refused to continue it.)
Under the “particular circumstances” of this case, which must be considered in evaluating the agency’s conduct (see Matter of Lisa Ann U., 75 AD2d 944; also Matter of Karas, 59 AD2d 1022, lv to app den 43 NY2d 646, supra), the agency’s efforts appear to satisfy the statutory standard. After six years of foster care for her child a mother with a commitment to a stable, continuing relationship would hardly require prodding to visit her; nor should this court second-guess the agency’s counseling approach towards respondent. Further, the agency’s efforts must be consistent with child’s best interest (Matter of Ray A.M., 37 NY2d 619, 621), and unwilling visits by respondent would hardly have met this criterion.
Finally, of major importance under the appellate decisions is the improbability that any agency effort could have succeeded in evoking visits by respondent before the time in 1977 when she expressed her willingness to re-establish contact. Consistent with the admonition that one “must not get lost in an analysis of the niceties of the precise degree of required diligence of effort” (Matter of Ray A.M., 48 AD2d 161, 164, affd 37 NY2d 617, supra), the appellate courts seem to concern themselves with the practical likelihood that greater agency efforts would have motivated the parent to remedy his failure of responsibility. See, for *984 decisions indicating that greater efforts would have been futile and holding the agency’s efforts to be sufficient, Matter of Ikem B. (73 AD2d 359, 364, 366); Matter of Karas (supra, at p 1023): additional agency efforts not required where chance of their success “minimal”.[11] Compare Matter of Florence X. (75 AD2d 942, 943), dismissing petition : parent “might well have responded to diligent efforts”. Here respondent’s apparent independence from the agency as to her emotional life and personal arrangements as well as the failure of the agency’s attempts to guide her regarding psychiatric care and in other respects, indicate the probable futility of efforts to propel her into contact with Marilyn when she did not wish to have it.
The diligent efforts requirement, which is absent from the termination statutes of many States,[12] seems intended primarily to avert the evil the court suggested in Matter of Leon RR (48 NY2d 117): an agency’s deliberate discouragement of a parent in order to lay a basis for termination of his rights and an advantageous adoption by foster parents (supra, at p 124). Respondent’s reliance herein on Matter of Leon RR, however, is wholly misplaced, for there the agency “actually hindered respondents’ efforts to maintain contact with Leon and plan for his future.” (Supra, at p 126.) Here there is no doubt of the agency’s good faith, to the present day, towards respondent.
4. Interim between Period of Neglect and Filing of Petition
The interim between the period of failed contact and the filing of the petition was unusually long in this case and respondent’s contact with Marilyn had been, to an unknown extent, re-established; however, these circumstances are not under the appellate rulings a bar to a finding of permanent neglect. The courts have read literally the provision that the parent’s failure “for a period of more than one *985 year following the date” of a child’s placement is the threshold question: any such period may be considered. See, e.g., Matter of Shantal M.K. (68 AD2d 482, 483, 486, supra), granting permanent neglect petition; “the critical period” of the mother’s lack of contact was September, 1974 to September, 1975; contact was renewed after the latter date and prior to the filing of the petition in September, 1976. Also see intervals in Matter of Melanie Ruth JJ (76 AD2d 1008,1009).
Policy justifications for the any-year rule relate to evidentiary problems as to the year prior to the petition, or the atypicality of that year, or administrative delays before filing, on the one hand; and on the other hand, the likelihood of persisting repercussions on the child of a year of quasi-desertion, and the harm to a child who cannot be returned to his mother of the continued ambiguity of foster care instead of adoption.[13] In the case at bar the disruption of the parent-child relationship through respondent’s failure to maintain contact from September, 1975 to April, 1977 began the series of procedural and human events leading to the filing of the petition. Thus, though in this court’s view it would have discretion to impose an equitable limitation period on a permanent neglect action, there is no warrant for an exception to the statutory coverage in this case.[14]
5. Notice to Respondent of Possibility of Termination
It has been suggested that due process of law may require a warning to the parent of the possibility of a permanent neglect proceeding, prior to the acts of neglect thereafter alleged against him (see Matter of Roxann Joyce M., 75 AD2d 872). However, even in a criminal case due process does not require such advance actual notice, but only that a statutory prohibition “by its terms provides a reasonably definite standard by which conduct can be measured”. (People v Klose, 18 NY2d 141, 146.)
*986 While agencies sometimes warn a parent of the possibility of a termination petition, a blanket requirement of such warnings is unsuitable. If parental attention can be elicited only by the threat of a permanent neglect finding, it would hardly demonstrate a parental sense of commitment and responsibility. And rather than a beneficial parent-child relationship, contact pressured by such a warning may consist of “ ‘perfunctory visits [that] are almost legal maneuvers by the mother to forestall a finding of permanent neglect.’ ” (See Matter of Shantal M.K., 68 AD2d 482, 484, supra, quoting the “relevant remarks” of Family Court Judge Gartenstein.)
In addition, in the instant case where the agency did not contemplate a permanent neglect petition nor think it appropriate to pressure respondent, the requirement of a warning cannot be judicially imposed as a condition of the rights of the other parties in this proceeding — the petitioners and the child — because it would frustrate the statutory scheme enacted in the foster care review provisions of the Social Services Law (§ 392) and the 1978 court order thereunder authorizing this petition.
D. BALANCE BETWEEN CHILDREN’S AND PARENTS’ RIGHTS
The guardian ad litem questions the constitutionality of relegating major consideration of the child’s best interest, including her purported desire for adoption by her foster parents, to the second stage of a permanent neglect proceeding, so that it becomes the central focus only if the court first finds neglectful conduct by the mother.
It is true that appellate and lower courts interpreted Matter of Bennett v Jeffreys (40 NY2d 543) as authority for a best-interests consideration under extraordinary circumstances, without such a neglect finding.[15] And where patent injustice to the child would result from the preclusion of adoption, this interpretation still seems to be applied. (See Matter of Suzanne N.Y., 77 AD2d 433, 436; see, also, Matter of Donna Dorene “G”, 70 AD2d 188,191,192,194.)
In Matter of Sanjivini K. (47 NY2d 374), however, the *987 court rejected the latitude to consider the child’s best interests that had been derived from Matter of Bennett (supra, at p 381). Matter of Sanjivini K. obviously serves the salutary purpose of limiting judicial discretion. Nevertheless, its holding, implicitly recognizing the dominance of the parent’s possessory right, might effect such a deprivation to a child that his constitutional rights seemingly would, as the guardian ad litem suggests, be implicated.[16] Regardless of this possibility, a lower court must of course follow Matter of Sanjivini K.
The State’s power to promote the child’s welfare is broader, however, than the agency suggests in its argument that Marilyn’s adoption is impermissible unless respondent is proved unfit.[17] The Matter of Sanjivini K. statement that “it is in the best interest of a child to be raised by his parents, unless the parents are unfit” (supra, at p 382) must be read in the context of the court’s acceptance of statutory permanent neglect proceedings (supra, at p 381). The statute was enacted to supplement judicial authority regarding the adoption of an abandoned child,[18] to enable a quasi-abandoned child also to secure through adoption a permanent, stable, nurturing and loving home. It precludes a parent from dropping a relationship with a child and then claiming it at will without regard for the harm inflicted on the child (see Matter of Roxann Joyce M., 75 AD2d 872, 873, supra). The quasi-abandoning parent to whom the permanent neglect statute applies, may, like an abandoning parent, be entirely fit as far as his.abstract capacity is concerned, but he is absent and unsustaining for the particular child.
In the balance of rights ordained by the State, however, the parent in a permanent neglect proceeding has greater defensive opportunities than in the case of a “settled” and *988 unequivocal abandonment.[19] For, once an abandonment is proved, an adoption can be automatically approved without a showing of any efforts by the agency to help the parent, without litigation of the best interest question and with proof of the parent’s conduct for only six months instead of a year.[20] Thus, the permanent neglect statute appears to be a constitutional “attempt to balance the rights of the parents against those of the child” (Matter of Anonymous [St. Christopher’s Home], 40 NY2d 96, 103, supra).

. In a foster care review proceeding in 1978, the foster parents secured an order pursuant to section 392 of the Social Services Law, authorizing them to institute this proceeding.

. According to information from the Clerk of the United States Supreme Court, this question may be decided in the pending case, Doe v Delaware (795932), which, however, is not scheduled for decision for some months.

. Stanley v Illinois (405 US 645); Quilloin v Walcott (434 US 246); Caban v Mohammed (441 US 380).

. Section 384-c states that it “shall not apply to persons entitled to notice pursuant to section one hundred eleven of the domestic relations law.”

. See, also, Kirkland v Board of Educ. (49 AD2d 693, 694); Matter of Figari v New York Tel. Co. (32 AD2d 434, 438); Matter of Marcus v Kaplan (20 AD2d 841, 842).

. These burdens on the adoption process were a primary reason for the decision upholding the constitutionality of the former New York provision which denied to all unwed fathers the right to veto their children’s adoption. (Matter of Malpica-Orsini, 36 NY2d 568, 572, app dsmd sub nom. Orsini v Blasi, 423 US 1042.) While the Supreme Court overruled its measure of implicit approval of this holding (see Caban v Mohammed, 441 US 380, 390, n 9, supra) the importance of minimizing these burdens was there recognized. (See Caban v Mohammed, supra, pp 392-393.)

. People ex rel. Rogers v Stanley (17 NY2d 256).

. See Matter of Patricia A. (31 NY2d 83, 89), holding that a provision applying to all females less than 18 years old “must be stricken as unconstitutional” with regard to those between the ages of 16 and 18.

. The agency’s acquiescence in almost eight years of foster care for Marilyn and its failure to enforce the policy of seeking a child’s adoption if he could not be returned to the parent in a reasonable time (Social Services Law, § 384-b, subd 7, par [a]; § 392) seems to have been due to its established concern for the wants of respondent, who had been a foster child under supervision of the same agency since her infancy.

. See, also, Matter of Lynn v Hults (26 AD2d 570, 571); Matter of Rosenfeld (213 NYS2d 1009, 1015, affd 18 AD2d 718); Mayer v Zim Israel Navigation Co. (289 F2d 562, 563, cert den 368 US 889); Broadcast Music v Havana Madrid Rest. Corp. (175 F2d 77, 79).

. See, also, Matter of Ray A.M. (supra); Matter of Amos HH (59 AD2d 795, 795-796); Matter of Diana S. (68 AD2d 915).

. See, e.g., NJ Stats Ann, §§9:2-9, 9:2-18; Conn Gen Stats Ann, §§ 17-43a, 45-61, subd (f); Pa Stats Ann, tit 1, §311; Mass Gen Laws Ann, ohs 210, 119. And see statutes cited, Matter of Jones (59 Misc 2d 69, 73, n 5); Katz, Model Act To Free Children for Permanent Placement (12 Fam Law Quart 205-252, esp 217-218, 224).

. Consider Matter of Shantal M.K. and Matter of Melanie Ruth JJ (supra); see Matter of Jones (59 Misc 2d 69, 71, supra); Matter of Stephen B (60 Misc 2d 662, 667, affd sub nom. Matter of Behrman, 34 AD2d 527).

. In the dispositional “best interests” hearing under section 623 of the Family Court Act, however, respondent’s conduct after April, 1977 and indeed after the filing of the petition will of course be relevant.

. E.g., Matter of Kim Marie J. (59 AD2d 716); Matter of Abbott House v Barbara J (55 AD2d 604); Matter of Boy (90 Misc 2d 35, revd 59 AD2d 662).

. See Matter of Bennett v Jeffreys (40 NY2d 543, 546, supra, and cases there cited) ; Planned Parenthood of Missouri v Danforth (428 US 52, 74) ; Smith v Organization of Foster Families (431 US 816, 840, n 43, 844-847, 850 [child’s possible interest and relationship to foster parents] ).

. This question was left open in Caban v Mohammed (441 US 380, 394, n 16, supra).

. Matter of Anonymous (St. Christopher’s Home) (40 NY2d 96, 101).

. See Matter of Susan W. v Talbot G. (34 NY2d 76, 80 [doctrine approved in Matter of Corey L v Martin L (45 NY2d 383, 389)]).

. Matter of Anonymous (St. Christopher’s Home) (40 NY2d, supra, at p 102); see Matter of Dlaine Bernice S. (72 AD2d 775), and Matter of Wesley L. (72 AD2d 137); Social Services Law (§ 384-b, subd 4, par [b]).