OPINION OF THE COURT
Chief Judge Cooke.
This is a proceeding to terminate parental rights instituted by petitioner St. Lawrence County Department of Social Services on the ground that respondents’ youngest child, Leon, is permanently neglected (Social Services Law, § 384-b, subd 7). The threshold issue raised on the appeal concerns the propriety of the admission into evidence of the child’s entire case file by petitioner as a business record over the objection of the natural parents. Ultimately, it must be determined whether petitioner proved, by a fair preponderance of the evidence, that respondents’ future plans for the child were inadequate despite diligent efforts on the part of the agency to strengthen and encourage the parent-child relationship.
After fact-finding and dispositional hearings, Family Court granted the petition permanently terminating respondents’ parental rights and directing that preference for Leon’s adoption be given to his foster parents. A divided Appellate Divi *121 sion affirmed, conceding that while the evidence concerning the inadequacy of respondents’ plans for the child was "less than overwhelming”, the best interests of the child mandated that parental rights be terminated (66 AD2d 118, 122).
 Reversal is required. The case file admitted by the court was replete with inadmissible hearsay which played a large part in the ultimate disposition of the case. Moreover, not only did petitioner fail to demonstrate the inadequacy of respondents’ future plans for the child, but the record conclusively demonstrates that it had so aligned itself against the natural parents as to render its efforts, if that is what they might be termed, to reintegrate Leon into his natural family insufficient to satisfy its statutory burden.
At the age of 19 months, Leon, together with two older siblings, was removed from the custody of his parents in a neglect proceeding. With one minor interruption, Leon has remained with his present foster parents for some eight years although his brother and sister were returned to the natural parents in 1976. At that time, Family Court directed that petitioner develop a plan to reintegrate the child into his natural family.
That plan, developed with the aid of a clinical psychologist who had conducted perfunctory interviews with Leon and his parents, provided that respondents visit Leon for a brief period at the foster home every other week. Those visits were monitored by a caseworker to assess their impact on the child. Despite the rather stifling conditions imposed on the manner of these visits, respondents were eventually permitted to take the child on a number of short, unsupervised trips in their car and, on one occasion, bring him to their home for a six-hour period. At the suggestion of petitioner, respondents secured a more suitable home in which to rear their children and eliminated a number of problems which had resulted in the initial loss of custody. Again, at the suggestion of the petitioner, the natural parents underwent an evaluation of their relationship with Leon at a State hospital and, until transportation and other difficulties forced them to discontinue, attended Parent Effectiveness Training classes sponsored by a different agency.
From the onset of Leon’s placement in the foster home in 1971, however, it was apparent that petitioner’s primary concern was not in uniting the child with his family. Rather than attempting to encourage the relationship between parent *122 and child, the agency fueled the foster parents’ sincere, but misplaced, desire to adopt the child, even suggesting at one time that they file a permanent neglect petition with the department "backing them”. Unsupervised visitation was discouraged on the basis of hearsay reports that Leon had become upset each time he saw his natural parents. Eventually, after a monitored visit in February, 1977, after which a psychologist concluded that Leon retained no affection for his natural parents, this permanent neglect proceeding was instituted.
At the fact-finding hearing, petitioner offered its entire case file on the child and his parents into evidence. Respondents’ objection, that admission of these materials en masse would be severely prejudicial as they could very well contain damaging hearsay, was rejected by the court. The court indicated, however, that while the entire file would be received in evidence, it would disregard all matters which would not survive a hearsay challenge. This was error. That this facile practice cuts against the grain of our adversary system is obvious. But, more important, it raises a substantial probability of irreparable prejudice to a party’s case for there is simply no way of gauging the subtle impact of inadmissible hearsay on even the most objective trier of fact. Nor is notice or an opportunity to respond afforded. These considerations are pointedly illustrated by this case in which the courts below placed strong reliance upon hearsay evidence to terminate respondents’ parental rights.
Each report in the files and each of the statements contained in those reports were admissible only if they qualified as business records (CPLR 4518, subd [a]). To constitute a business record exception to the hearsay rule, the proponent of the record must first demonstrate that it was within the scope of the entrant’s business duty to record the act, transaction or occurrence sought to be admitted. But this satisfies only half the test. In addition, each participant in the chain producing the record, from the initial declarant to the final entrant, must be acting within the course of regular business conduct or the declaration must meet the test of some other hearsay exception (Johnson v Lutz, 253 NY 124, 128; Toll v State of New York, 32 AD2d 47, 50). Thus, not only must the entrant be under a business duty to record the event, but the informant must be under a contemporaneous business duty to report the occurrence to the entrant as well (Richardson, *123 Evidence [10th ed — Prince], § 299). The reason underlying the business records exception fails and, hence, the statement is inadmissible hearsay if any of the participants in the chain is acting outside the scope of a business duty (Johnson v Lutz, supra).
In this case, petitioner was under a statutory duty to maintain a comprehensive case record for Leon containing reports of any transactions or occurrences relevant to his welfare (Social Services Law, § 372; 18 NYCRR 441.7 [a]), thus satisfying this aspect of the business records test (see Kelly v Wasserman, 5 NY2d 425, 429). Some of the entries in the case file were based on firsthand observations of Leon’s caseworker which were recorded shortly after the occurrences, rendering them admissible. Many of the remaining entries, however, consisted of statements, reports and even rumors made by persons under no business duty to report to petitioner. Especially in the context of this case, it is essential to emphasize that the mere fact that the recording of third-party statements by the caseworker might be routine, imports no guarantee of the truth, or even reliability, of those statements. To construe these statements as admissible simply because the caseworker is under a business duty to record would be to open the floodgates for the introduction of random, irresponsible material beyond the reach of the usual tests for accuracy —cross-examination and impeachment of the declarant. Unless some other hearsay exception is available (Toll v State of New York, supra), admission may only be granted where it is demonstrated that the informant has personal knowledge of the act, event or condition and he is under a business duty to report it to the entrant (Johnson v Lutz, supra; cf. Model Code of Evidence, rule 514).
Indeed, given the complexity and sheer volume of this case record, the better practice would have been for petitioner to have given respondents notice and an opportunity to examine the file prior to the hearing (cf. Richardson v Perales, 402 US 389, 404-405). As a practical matter, respondents had no way of determining that the statements appearing in the file would jeopardize their parental rights until the file was introduced at the hearing. This furnished them little, if any, real opportunity to ascertain the respective business duties of the entrant and declarant, to examine those persons concerning the circumstances surrounding the entry and to introduce evidence to rebut the statements contained in the file. As a matter of *124 fundamental fairness, then, before such a massive document is sought to be introduced into evidence, the proponent, normally as a matter of good practice, should give his adversary notice of that intention sufficiently far in advance of trial to allow the opponent an opportunity to investigate (Meyer, Should Notice be a Prerequisite to Use of Prima Facie Evidence, 19 NYLF 785, 788-790). If notice is not given, upon timely application the court, in its discretion, may properly grant a reasonable continuance so that the opponent may at least acquaint himself with the contents of the document.
Although the admission of the entire case file, standing alone, is sufficient to warrant reversal, it is appropriate, given the magnitude of the rights involved, to reach the merits of the proceeding. At the outset, it must be emphasized that termination of parental rights does not hinge upon a comparison of the relative benefits offered a child, by his natural family to those offered by the foster family (see Matter of Sanjivini K., 47 NY2d 374). Nor may it be accomplished with reference to one’s belief of where the best interests of the child might lie. To be sure, the State, in its role as parens patriae, has a strong interest in protecting its children. Yet, but interposing itself between parent and child, the State not only involves itself in one of the most delicate of societal relationships, but treads on sensitive constitutional ground as well (Pierce v Society of Sisters, 268 US 510, 535; cf. Matter of Hofbauer, 47 NY2d 648). Simply stated, parents who are fit to raise their child are constitutionally entitled to do so (Stanley v Illinois, 405 US 645, 657-658). As we have stated previously, "a court may not terminate all parental rights by offering, a child for adoption when there has been no parental consent, abandonment, neglect or proven unfitness, even though some might find adoption to be in the child’s best interests” (Matter of Sanjivini K., supra, at p 382; see, also, Matter of Corey L v Martin L, 45 NY2d 383, 391-392).
Petitioner brought this proceeding to terminate respondents’ parental rights on the theory that Leon was a permanently neglected child, necessitating that it prove that respondents "failed for a period of more than one year following the date , such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency’s diligent efforts to encourage and strengthen the parental *125 relationship when such efforts will not be detrimental to the best interests of the child” (Social Services Law, § 384-b, subd 7, par [a]; see, also, Family Ct Act, § 611). The record convincingly establishes that respondents availed themselves of every opportunity to visit their son notwithstanding the many obstacles thrown in their path by petitioner. There remains, then, only the question of the adequacy of respondents’ plan for the future of their child and an inquiry into the efforts of petitioner to strengthen the parent-child relationship.
The statute requires that respondents formulate a feasible plan not only for the future of the child but for themselves as well (see Matter of Orlando F., 40 NY2d 103, 110). This requirement presupposes, at a minimum, that the parents take steps to correct the conditions that led to the removal of the child from their home (see Matter of Ray A. M., 37 NY2d 619, 622-623). Yet, the planning requirement also obligates the parents to project a future course of action, taking into account considerations of how the child will be supported financially, physically and emotionally. Certainly, a degree of prescience and insight that some people lack — especially the parents of a child who has been involuntarily removed from their custody — is demanded. For this reason, the adequacy of the parents’ plan must not be evaluated with reference to unrealistically high standards (see Gordon, Terminal Placements of Children and Permanent Termination of Parental Rights: The New York Permanent Neglect Statute, 46 St John’s L Rev 215, 237). It is also the reason that the Legislature wisely imposed an obligation on the part of the agency to strengthen the relationship between parent and child.
On this record, it is impossible to conclude that respondents’ plans for Leon’s future were inadequate. Respondents have done all that might reasonably be expected of them in preparing for the return of their child. They have taken pains to remedy a number of personal problems which led to the initial removal of three of their children. They have secured employment, located more suitable living quarters, and have followed, with one minor exception, what little guidance was furnished them by petitioner. They have sought psychological counseling to better cope with their problems and those of the boy. Indeed, in view of the fact that Family Court, with the consent of petitioner, has ordered Leon’s older siblings returned to respondents, it is difficult to comprehend in what *126 manner respondents’ plan for the future of Leon is inadequate.
We would be remiss, however, to permit the actions of petitioner throughout Leon’s placement to pass without comment. An agency such as petitioner is vested with a unique and, to be sure, most difficult responsibility. It must at once serve as the guardian of the best interests of the child (Social Services Law, § 371) and yet, render diligent efforts to strengthen the very relationship which, in some cases, it has circumscribed (Social Services Law, § 384-b, subd 7). These duties, however, are by no means contradictory; indeed, they are complementary. One of the fundamental values in our society is that which respects and fosters the relationship between parent and child. Thus, our permanent neglect statute reflects a cultural judgment that society should not terminate the parent-child relationship unless it has first attempted to strengthen it.
The actions of petitioner in this case fell far short of its statutory mandate to exercise due diligence to foster the parent-child relationship (Social Services Law, § 384-b, subd 7, par [a]). Indeed, the record indicates that petitioner actually hindered respondents’ efforts to maintain contact with Leon and plan for his future. Not only did it align itself with and encourage the expectations of the foster parents who wished to adopt the child but, more egregiously, from the onset of placement it actively sought to plant the seeds from which a finding of permanent neglect might grow. Petitioner’s claim that the best interests of the child excused it from encouraging the parental relationship must be rejected. Given the frequency of contact between parent and child permitted by petitioner, the rigorous conditions imposed on those visits and the duration of Leon’s foster care, it is hardly surprising that a child of tender years might adversely react to any change of custody. This possibility, standing alone, did not relieve petitioner of its duty — an obligation which it never undertook.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the petition for permanent termination of parental rights dismissed.
Judges Jasen, Gabeielli, Jones, Wachtler, Fuchsberg and Meyer concur.
Order reversed, etc.