OPINION OF THE COURT
Leah R Marks, J.
This is a proceeding brought as a result of the Appellate Division, First Department, reversal of three orders discharging three children from foster care to the custody of their parents which directed this court to provide findings and was without prejudice to reopening the hearing to allow certain testimony from the foster parents.
The orders resulted from a proceeding brought under section 392 of the New York State Social Services Law to *220 determine whether foster care should be continued for the three children.
With the consent of the petitioning agency which had appealed the original decision, this court heard new evidence concerning the period from the July 27, 1979 order which was appealed to the new hearing’s beginning on May 28, 1980, in order to determine whether the original order remained suitable in view of the present situation.
1979 HEARING AND FINDINGS
The petitions verified on July 14, 1978 and duly filed with the court under which the commissioner asked that the children be continued in foster care were based on the allegations in each petition that the “Parents are unable to resume care at this time as mother is attending Van Etten Hospital because of Emotional problems. Parents maintain an interest in child and visitations are regular. Plan is continued care in the present foster home until child can be discharged to parents.”
In fact, the case did not come to trial until July, 1979, when the children had been in foster care for another full year. Their ages at that time were 8, 9 and 11; they had been in foster care for six years.
After the court hearing, it was found that the petitioner had not sustained the burden of proof sufficient to support the allegations of the petition that the mother’s emotional problems would prevent return of the children at that time.
The agency had presented evidence that the mother had an alcoholic problem. The court found that although this had been true in the past, the problem was in a state of remission and had been in such a state for some time by July, 1979. Psychiatric testimony indicated that there was no longer any danger from her alcoholic problem at that time. The most substantial testimony in support of the allegations of alcoholism was in regard to an incident in which the mother tripped during a visit. The court found that even if she had alcohol on her breath at that time, one incident was not sufficient to prevent the return of the children.
The court also found that the mother had mental health *221 problems having been diagnosed schizophrenic. However, the doctor treating her indicated that this state was also in remission, and the doctor said there was no reason to believe she was unable to care for the children at this time. The court found that such a situation did not support refusal to return the children, but found it doubtful that the mother could handle the return of all the children at one time.
The only allegations against the father related to his poor work habits, his ostensible lack of interest in obtaining employment, his living off public funds rather than his own efforts. All were found to be true. The petitioner did not allege such facts as a basis for failing to return the children, and the court found them no basis.
The couple had a baby at home and there was no evidence that this child was maltreated in any way.
The inability of the petitioner to support its own allegations led the court to order return of the children at separate times over a period of a few months, with reports coming to the court regularly from the mother’s psychiatrist. The purpose of the reports was to permit the court’s immediate reconsideration of the desirability of the return of any child if the stress was too great for the mother.
The danger that the mother might not be able to care for all the children was clear, and the order provided for that contingency. The first child to be returned home under the order was the child who expressed the greatest desire to go home. In the process of return, if the mother were incompetent to handle the children, that incompetence would lead to a partial or whole reversal of the court’s order. If the mother failed to see her psychiatrist, that fact would also end the children’s return.
At that time the children had no objections to their return although they had some doubts. Two of the children were very close to the foster parents, always a problem in foster care review cases where the children are lucky enough to have loving foster parents.
THE HEARING OF 1980
During the last year, the father had used unacceptable physical punishment and has proven himself to be a de *222 manding person who insists that his children obey him in every way and give him complete obeisance no matter how close they may feel toward their foster parents or a way of life different from his own.
He has said on the witness stand that he believes the children are his, and they must do as he tells them to do. He said that he expects his daughter to dress differently when she lives with him and to change her name to conform to his idea of proper Islamic names.
The father admits to drinking a substantial amount although not to the extent that the children claim or to the extent that such drinking alone would render him unfit.
The father’s demeanor in court, his whole testimony and his behavior toward the children during visits makes it clear that he is incapable of understanding the difficulties the children will have in returning home from other adults they love and other environments in which they are happy. He has no realization that the children have needs apart from his directives. This complete lack of understanding on the father’s part is evidenced not only in his treatment of the children and his intentions as stated, but in his failure to co-operate with the case worker during the last year when the case worker was attempting to help fulfill the agency’s obligation to work for the return of the children to the natural parents.
The mother remains a person who needs psychiatric treatment but whose condition seems one in which she is unable to cope with his present responsibilities. The result to her health of the return of the three children to the home remains questionable.
In addition, the mother’s courtroom demeanor and testimony on the witness stand leave doubts as to her ability to care for the children in view of the father’s attitude. She is unable or unwilling to contradict anything he states as fact or as intention. If the mother’s reaction to the father’s inability to understand the children is to lie to protect him, the mother cannot be relied upon as a source of strength and protection for the children if they are returned home.
*223 Another new factor in the situation is the immediate return of a much older son from prison. Although the mother and father deny any problems will result from having him in the home either for themselves or for the other children, it is clear that any new person in the home is bound to add to the family’s stresses; certainly a person with the oldest son’s background will have even greater problems and add even more stress then would otherwise be the case.
THE LAW
This was and continues to be a proceeding to determine whether these children should remain in foster care. The parties who have been most active are the natural parents and the agency although there are foster parents who have an interest in the children’s future. This is not an action for termination of parental rights nor has there been any request that the court order a proceeding for termination of parental rights.
It is true that subdivision 7 of section 392 of the New York State Social Services Law says that the court’s findings supporting its determination must be in “accordance with the best interest of the child.”
Although the Appellate Division’s order in relation to its reversal indicates that the court must consider “the best interest of the child”, the duty under section 392 must be interpreted in accordance with section 384-b of the New York State Social Services Law which deals with termination of parental rights. The legislative intent regarding foster care is clearly stated in subdivision 1 of section 384-b, “The legislature hereby finds that: (i) it is desirable for children to grow up with a normal family life in a permanent home” and “it is generally desirable for the child to remain with or be returned to the natural parent because the child’s need for a normal family life will usually best be met in the natural home”.
It is the legislative intent as set forth in the statutes and supported by case law, that foster care should be continued or termination proceedings begin only “when it is clear that the natural parent cannot or will not provide a normal *224 home for the child”.[1] The Legislature has found that children’s remaining in foster care without other plans may “have deleterious effects on their development into responsible, productive citizens”.[2] “The goal of foster care * * * is * * * to prepare the child for his return to his real parents or placement in a permanent adoptive home”.[3]
The court can have no greater powers in a foster care continuation proceeding than it would have in a termination of parental rights proceeding. This is not and ought not to be viewed as a means of depriving natural parents of the custody of their children in situations where termination of parental rights would never be permitted. “If a State were to attempt to force the breakup of a natural family * * * for the sole reason that to do so was thought to be in the children’s best interest, I should have little doubt that the State would have intruded impermissibly” (Smith v Organization of Foster Families, 431 US 816, 862-863). The legislative intent in establishing foster care review was to have the court ensure children will not be lost in foster care forever.
Insofar as there may be any difference in the powers in a foster care continuation proceeding in relation to depriving parents of their child, “the best interest” requirement under foster care continuation proceedings leaves the court power to develop a plan under which the children would be returned to the parents over a reasonable period of time during which foster care would be continued.
The parent’s right to the child is greater than the rights of others unless there is a showing of unfitness, extraordinary circumstances to which the parent has voluntarily contributed which indicate return would result in great detriment for the child, or grounds for termination of parental rights. (Matter of Sanjivini K., 47 NY2d 374; Matter of Bennett v Jeffreys, 40 NY2d 543; Matter of Leon RR, 48 NY2d 117.) A parent cannot be displaced because someone else might do a better job. (Matter of Corey L v *225 Martin L, 45 NY2d 383, 392.) This means a parent cannot be displaced by keeping a child in foster care for the sole reason that someone else might do a better job as a foster parent than the biological parent may do.
Parents and the agency do not have equal rights, nor do foster parents and parents. Only if the court found the parents unfit to perform their parental tasks or has reason to find swift transfer of custody harmful to the child, can the court entertain the possibility of refusing to give the children to their own parents now. (People ex rel. Niesling v Nassau County Dept. of Social Servs., 46 NY2d 382, 389; People ex rel. Wilson v Wilson, 56 AD2d 794.)
During the 1979 hearing there was no convincing evidence presented that the mother or father was unfit to be a parent or that the release to the parents of the three children separately, over a period of a few months would result in grave detriment to any child so long as regular psychiatric reports were reviewed. The burden is on the agency to show unfitness of the natural parent. (Matter of Robertson v Robertson, 54 AD2d 1081; Matter of Rodriguez v Dumpson, 52 AD2d 299.) That burden was not sustained in the 1979 hearing except to the extent of indicating the court should establish a plan for return that would terminate if the mother’s former active mental illness returned, a mental illness that had been in a state of remission for a long period of time.
A court may not, in effect, limit parental rights by continuing foster care when there has been no parental consent, abandonment, neglect or proven unfitness, even though there may be foster parents who love and wish to cherish the child and may be thought to have a desirable family life to offer that is more desirable than the natural parents’ family life. (Matter of Corey L v Martin L, 45 NY2d 383, supra; Matter of Sanjivini K, 47 NY2d 374, supra.) Parents are generally best qualified to care for their own children and are, therefore, entitled to do so. (Matter of Bennett v Jeffreys, 40 NY2d 543, supra.)
Thus, the children were ordered home under a plan that seemed suitable given the evidence at the time which did not *226 support the allegations of the petition for continuation of foster care. However, the facts found in the hearing of 1980 have shown unfitness of the father while the condition of the mother remains as it will be unless stress leads to her unfitness.
Therefore, it is legally proper to grant the agency continuation of foster care at this time, along with the following orders:
(1) The mother is to contiue treatment with Dr. P. or, if she changes psychiatrists, she shall present complete information about the new psychiatrist to the court with copies to all attorneys in this case.
(2) The psychiatrist is to inform the court of the number of times the mother has come for treatment during the preceding months, the number of times the mother has failed to come for treatment although asked (for the same period) and whether the mother seems able to care for the family at home, and for the children during their visits.
(3) The mother is to grant her psychiatrist permission to share that information with the court, sending it every three months; beginning with a report no later than August 15,1980. The mother is responsible for ensuring that such a report is sent to the court no less than every three months.
(4) The agency is directed to provide or arrange for all services needed by the children, their parents and their foster parents to encourage and steadily strengthen the natural parent-child relationships. Such service shall include but shall not be limited to regular counseling and therapy for both parents and the children to help all understand the special problems that exist for each as a result of the years of separation, and to help the parents to understand the means of overcoming these problems with the least possible pain for the children. Insofar as considered necessary by the professionals involved, the foster parents shall also be requested to participate in such sessions and shall have such sessions available for them if they request it.
(5) Each parent shall co-operate in all services provided or arranged by the agency which are intended to encourage each parent’s relationship with the children.
*227 (6) The children shall visit with the parents in accordance with the present visitation schedule and shall be permitted more visitation with the parents if they request it or the therapist in charge of family therapy deems it wise.
(7) Foster care is continued to March 1, 1981, at which time the agency may petition for continued foster care if that seems desirable.

. Social Services Law, § 384-b, subd 1, par (a), cl (iv).

. Social Services Law, § 384-b, subd 1, par (b).

. Smith v Organization of Foster Families, 431 US 816, 862 (Stewart, J., concurring).