(May 27, 1986)

■ ANN LEYVA, Individually and as Administratrix of the Estate of GUSTAVO E. LEYVA, Deceased, Respondent-Appellant, v ABRAHAM LEVY, as Public Administrator of the County of Bronx and as Administrator of the Estate of JAMES R. RICHARDSON, Deceased, Appellant-Respondent, and CITY OF NEW YORK, Respondent. (Action No. 1.) CHARLES McNEIL et al., Appellants, v ABRAHAM LEVY, as Public Administrator of the County of Bronx and as Administrator of the Estate of JAMES R. RICHARDSON, Deceased, et al., Respondents-Appellants, and ANN LEYVA, Individually and as Administratrix of the Estate of GUSTAVO E. LEYVA, Deceased, Defendant, and CITY OF NEW YORK, Respondent. (Action No. 2.) YVONNE FOSS, Respondent-Appellant, v DRAH CAB CORPORATION et al., Appellants-Respondents, and CITY OF NEW YORK, Respondent. (Action No. 3.) —Consolidated appeals, by order of this court, entered October 31, 1985, from an interlocutory judgment, Supreme Court, Bronx County (Irwin M. Silbowitz, J.), entered December 7, 1984, after a jury trial on the issue of liability, upon a verdict in favor of plaintiffs which found: (a) defendant Abraham Levy, public administrator of the estate of James R. Richardson (Administrator Levy) to be 75% negligent, (b) plaintiff in action No. 1 and defendant in actions Nos. 2 and 3, Ann Leyva, as administratrix of the estate of Gustavo E. Leyva (Administratrix Ann Leyva) and defendant Drah Cab Corporation (Drah Cab) together to be 15% negligent, and (c) defendant the City of New York (City) to be 10% negligent, and, thereafter, the trial court: (a) granted the City's motion to set aside the verdict of 10% liability against it, and (b) then reapportioned the subject 10% liability among defendant Mr. Richardson's estate, Mr. Leyva's estate which is the plaintiff in action No. 1 and defendant in actions Nos. 2 and 3, and Drah Cab, so as to increase the liability of Mr. Richardson's estate from 75% to 83%, and to increase the liability of Mr. Leyva's estate and Drah Cab from 15% to 17%, is modified, on the law and the facts, without costs, to order a new trial on the apportionment of the subject 10% liability only among the estates of Mr. Richardson and Mr. Leyva and Drah Cab,

unless the aforementioned parties, within 20 days after service upon them of a copy of this court's order, with notice of entry, serve and file in the office of the clerk of the trial court a written stipulation consenting to accept the apportionment of the subject 10% liability as ordered by the trial court, in which event the judgment, as so modified, is otherwise affirmed, without costs.

At some time after 3:00 A.M. on May 10, 1977, an automobile driven by James R. Richardson (Mr. Richardson) collided with a taxicab driven by Gustavo E. Leyva which contained two passengers, named Charles McNeil (Mr. McNeil) and Yvonne Foss (Ms. Foss). This accident took place on the Major Deegan Expressway (Expressway) in The Bronx. The collision was headon, and both drivers were killed, while the two taxicab passengers survived, with severe injuries. Drah Cab Corporation (Drah Cab) owned the taxicab.

As a result of the accident, a wrongful death and two personal injury actions were commenced. These actions are: (1) in action No. 1, Mrs. Ann Leyva, individually and in her capacity as administratrix of her husband's (Mr. Leyva) estate, brought a wrongful death action against Abraham Levy, Public Administrator of Bronx County, in his capacity as administrator of Mr. Richardson's estate, and the City of New York, based upon the alleged negligence of Mr. Richardson and the City; and, (2) in actions Nos. 2 and 3, passenger Mr. McNeil and his wife, Angelina, as well as passenger Ms. Foss, brought personal injury actions against the Administrator, Drah Cab, Administratrix Mrs. Leyva, and the City, based upon the alleged negligence of not only Richardson and the City, but also of Mr. Leyva. The answers of the defendants in the three actions asserted, *inter alia,* cross claims seeking indemnification or contribution.

Upon the joint trial of these three actions on the single issue of liability, the jury returned a verdict finding Mr. Richardson 75% negligent, Mr. Leyva and Drah Cab 15% negligent, and the City 10% negligent. Thereafter, the trial court, *inter alia,* (1) granted the City's motion to set aside the verdict against it, and (2) reapportioned liability solely among the Administrator and the Administratrix and Drah Cab, so that Mr. Richardson's liability was increased from 75% to 83%, and the liability of Mr. Leyva and Drah Cab was increased from 15% to 17%.

The following is the pertinent evidence adduced at the trial:

It is undisputed that the Van Cortlandt Park South exit of

the Expressway divides into two roadway ramps or "mouths". One of the ramps, which bears to the right and heads in a westerly direction on Van Cortlandt Park South towards Broadway, is known as the Park ramp, while the other ramp veers to the left and heads out in a northerly direction to the Expressway's Service Road, which leads to Bailey Avenue, and this Service Road is known both by the names of the Golf Course Road and the Service Road ramp.

Furthermore, it is undisputed: (1) that approximately 12 years before the accident, the City had installed a "Do Not Enter" sign at the bottom of the Park ramp, so that it faced traffic coming east on Van Cortlandt Park South; (2) that there was no such sign, as mentioned *supra,* on the Service Road ramp; and, (3) that, on the Service Road ramp, in order to prohibit vehicles from entering it, there was a double yellow line running down the middle of it.

Just before the accident, New York City Police Officers Paul Wishrad (Wishrad) and Arthur Schwartz (Schwartz), who were assigned to the 50th Police Precinct's anticrime plainclothes detail, were traveling in an easterly direction on Van Cortlandt Park South in an unmarked police car, and they were several car lengths behind Mr. Richardson's vehicle. Officer Schwartz testified that his partner and he observed Mr. Richardson stop at a traffic light that was located "at the exit ramp of the Van Cortlandt Park South exit from the Major Deegan coming southbound." At this point the officers noted nothing unusual about Mr. Richardson's driving.

According to both officers' testimony, when the traffic light changed, Mr. Richardson's vehicle moved forward at a speed of between 20 and 25 miles per hour. Subsequently, the officers saw that after Mr. Richardson had driven about half a block, he made a left turn across the double yellow line on Van Cortlandt Park South and suddenly entered the Expressway exit. The two officers testified unequivocally that the Richardson vehicle entered this exit's Park ramp, which, as mentioned *supra,* had a "Do Not Enter" sign.

Based upon Mr. Richardson's unexpected action, the officers immediately drove their car onto the Park ramp in an attempt to stop Mr. Richardson. When their car entered the Park ramp, the officers were approximately 10 feet away from Mr. Richardson. In an effort to attract Mr. Richardson's attention, whose car was still traveling at between 20 to 25 miles per hour, Officer Schwartz put a portable turret, or red dome light, on the dashboard of the unmarked car, while

Officer Wishrad, who was driving, repeatedly honked the car's horn. When the Richardson vehicle reached the Expressway, the officers were still very close to his car. Instead of paying heed to the warning signals of these officers and stopping, Mr. Richardson accelerated his automobile with a sudden burst of speed, and proceeded south on the northbound lanes of the Expressway. For safety reasons, the officers did not immediately pursue Mr. Richardson onto the Expressway. Soon thereafter the officers heard the subject collision, and arrived at the accident scene several minutes later.

The City put in medical evidence of Mr. Richardson's physical condition at the time of the accident. The City's medical expert, Dr. Jesse Bidanset, testified, in pertinent part: (1) that he is the Chief Toxicologist of Nassau County; (2) that he has had extensive experience and knowledge as to the effect that different levels of alcohol have on people; (3) that, in view of the fact that the report of the autopsy of Mr. Richardson indicated that his brain tissue had an ethyl alcohol level of .29%, Dr. Bidanset concluded that Mr. Richardson would not have been able to see clearly "and even if he were to see something clearly, he probably wouldn't have the sense to recognize what was going on"; (4) that individuals are considered to be intoxicated if their alcoholic level is greater than .15%, and Mr. Richardson's alcoholic level, "was approximately twice that level"; (5) that at the level of alcoholic concentration that Mr. Richardson had "many individuals * * * would be asleep"; and, (6) that, although acknowledging that Mr. Richardson appeared to have been able to perform some driving maneuvers, which he should not have been able to perform with an alcoholic level of .29%, Dr. Bidanset emphasized that in his opinion an individual "at .29 percent [alcoholic concentration] is severely intoxicated and it would adversely affect all of the skills necessary to operate a motor vehicle." None of the other parties presented any medical evidence to refute Dr. Bidanset's conclusions.

Injured taxicab passenger McNeil called an engineer named Marvin Specter (Mr. Specter) as an expert witness. Mr. Specter testified, in pertinent part, that the absence of a "Do Not Enter" sign on the Service Road ramp could have caused Mr. Richardson's accident. However, as mentioned *supra,* the two police officers, who were the only witnesses that testified to seeing which ramp Mr. Richardson actually used, unequivocally testified that Mr. Richardson used the Park ramp, which had the "Do Not Enter" sign. In view of the eyewitness

testimony by the officers, engineer Specter's testimony becomes no more than unsupported speculation.

Also, the City produced an engineering expert, named Stanley Fein (Mr. Fein), whose testimony concentrated on what could have occurred after Mr. Richardson entered the Expressway. In pertinent part, Mr. Fein testified: (1) that, in his opinion, if Mr. Leyva was driving his taxicab at approximately 60 miles per hour, and if Mr. Richardson was driving his vehicle at approximately 40 miles per hour, and if both vehicles had their headlights on, then each driver *should have* seen the lights of the other vehicle when they were within 1,000 feet of each other, and if one or both of them had reacted to seeing the other party's car, they would have avoided colliding with each other; and, (2) that a motorist who is mistakenly traveling south in the northbound lanes of the Expressway would be alerted to that fact, since: (a) all of the traffic and the median barrier would be to his right, (b) the backs of the roadway signs on the northbound lanes and the faces of the signs in the southbound lanes on the other side of the barrier would be facing him, and, (c) the headlights on his side of the barrier would be coming toward him.

Following the jury's verdict which, *inter alia,* held the City 10% liable, the trial court granted the City's motion to set aside the verdict, and dismissed all claims against the City. The trial court, in granting this motion, stated that "there is absolutely no evidence to indicate that the City was in any way responsible, or that the City's act [of not having a sign on the Service Road ramp] proximately caused this accident". After reviewing the record, we agree with the trial court's conclusion. We find that in the instant case "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial" *(Cohen v Hallmark Cards,* 45 NY2d 493, 499 [1978]).

Appellants Mrs. Leyva, Mr. and Mrs. McNeil and Drah Cab, as well as the dissent, argue that the trial testimony of Officer Wishrad that Mr. Richardson used a sign marked Park ramp, was impeached by the testimony he gave at an earlier examination before trial. According to the appellants and the dissent, the officer's examination before trial testimony leads to a reasonable inference that Mr. Richardson actually entered the signless Service Road ramp, and, therefore, this alleged conflict was for the jury to resolve, since "different inferences may be drawn [and] the credibility of witnesses is in question" *(Dolitsky v Bay Isle Oil Co.,* 111 AD2d 366 [1985]).

In support of this contention, they rely on a short excerpt from the transcript of the examination before trial, in which Wishrad is answering questions about the manner in which he maneuvered the police car back out of the exit, in order to try and catch Mr. Richardson, after Mr. Richardson had entered the Expressway. In substance, they point to the following questions and answers for their conclusion that Wishrad allegedly admitted that Mr. Richardson used the unsigned Service Road ramp:

"QUESTION: [By Counsel for Mrs. Leyva] Which mouth [ramp] did you exit out of?

"ANSWER: I exited the service road which would be heading south.

"QUESTION: South on the service road?

"ANSWER: Yes, sir.

"QUESTION: That would be the exit that the Richardson vehicle entered, is that correct?

"ANSWER: Yes.

"QUESTION: Did you observe whether there were any signs or traffic control devices controlling the exit of the mouth that you exited on to the service road, right at the exit mouth itself?

"ANSWER: No, there were no signs that I recall."

Based upon our examination of this entire 31-page examination before trial, we find that the answer, in one isolated place, of Officer Wishrad that he apparently exited on the Service Road ramp when he was trying to catch Mr. Richardson's car, does not, in and of itself, raise a factual issue for the jury. Just a few pages before at this same examination before trial, when Officer Wishrad was asked the direct question of which ramp Mr. Richardson entered, this officer, without hesitation, answered the signed Park ramp. Obviously the officer had to maneuver the police vehicle through the same exit that Mr. Richardson had previously entered, in view of the fact that there was only *one exit,* but there were *two ramps.*

At pages 454 and 455 of the dissent, there is a claim that we erroneously considered the entire examination before trial of Officer Wishrad, even though allegedly this entire examination before trial was not in the record. With all due respect, the dissent is wrong. Review of the more than 700-page transcript indicates that counsel for appellants Mrs. Leyva and Mr. and Mrs. McNeil, as well as the counsel for the City,

read that examination before trial or deposition into the record. The citation to the pages of the record where these counsel admit to reading this examination before trial into the record follows:

(1) At page 571, Mr. Gair, counsel for Mrs. Leyva, stated, in pertinent part: "The deposition of * * * Officer Schwartz and Officer Wishrad were [sic] read in";

(2) At page 620, Mr. Saul, counsel for the City, during his summation, stated, without objection, "The officers [Wishrad and Schwartz] clearly stated that he [deceased Mr. Richardson] went in off, directly off and made a left turn directly off Van Cortlandt Park South. They said it at the EBT [examination before trial] and they said it here"; and,

(3) At page 669, Mr. Voletsky, counsel for Mr. and Mrs. McNeil, stated in his summation: "The depositions were read of Mr. Wishrad, and * * * of Mr. Schwartz".

Furthermore, appellants Mrs. Leyva and Drah Cab point to an excerpt from the examination before trial of Frank Piturro (Mr. Piturro) to allegedly support the jury's verdict against the City. Mr. Piturro testified at the trial and he was called as a witness by Mrs. Leyva. In pertinent part, Mr. Piturro testified: (1) that at the time of the accident, he was the Bronx Deputy Borough Engineer of the City's Transportation Department; (2) that he was involved in the maintenance of proper roadway signing at the subject Expressway exit; (3) that, as a result of receiving police notification of the instant accident, on May 18 or 19, 1977, several days after the accident, Mr. Piturro went to investigate the Expressway's Van Cortlandt Park South exit, as to roadway and signing conditions; (4) that, at this site, he found the posted Park ramp and the unposted Service Road ramp; (5) that he concluded that the Park ramp was adequately controlled by its "Do Not Enter" sign, but since the Service Road ramp did not also have such a sign he took photographs of it; (6) that, in his opinion, a "Do Not Enter" sign was not necessarily needed on the Service Road ramp, in view of the fact that, inter alia, "there was a double yellow line in the middle of the roadway"; and, (7) that, while at a deposition before trial he testified that he had "assumed" that the unsigned Service Road ramp caused the accident, he conceded at trial that the police had not informed him which ramp Mr. Richardson had in fact entered. Appellants argue that Mr. Piturro's assumption that the accident occurred as a result of Mr. Richardson entering the unsigned Service Road ramp is a sufficient basis to raise an issue of fact

for the jury to consider. We disagree, and reject as meritless appellants' argument about Mr. Piturro's assumption, since, in view of Mr. Piturro's own testimony that the police had not informed him which ramp Mr. Richardson used, we consider Mr. Piturro's assumption to be no more than pure speculation. Such speculative testimony does not provide a rational basis for the jury's verdict *(see, Blum v Fresh Grown Preserve Corp., 292 NY 241, 245 [1944]; Alexander v Eldred, 63 NY2d 460, 464 [1984]).*

On page 456 of the dissent, it is stated "With reference to no-passing markings, Vehicle and Traffic Law § 1126 (b) provides that such markings do not, however, prohibit a driver from turning left to enter or leave a highway". Examination of the cited portion of the Vehicle and Traffic Law indicates that it is contained in a section (§ 1126) entitled "No-passing zones", and we find no part of section 1126 that legally permitted Mr. Richardson to enter the Expressway in the manner he did. For this reason, we find the dissent's citation of section 1126 to be misleading. Even, counsel for Mrs. Leyva admitted in his summation, at page 683 of the record, that: "Now as to Mr. Richardson, there's no doubt that he did cross a double yellow line. You [the jury] heard testimony about that, both Officer *[sic]* Wishrad and Schwartz stated that. He [Mr. Richardson] *was negligent for crossing a double yellow line"* (emphasis supplied).

Moreover, the appellants, Mrs. Leyva, Mr. and Mrs. McNeil and Drah Cab, contend that an entry in the Police Department's Accident Investigation Squad (AIS) report of the accident should not have been redacted, and that it was reversible error for the trial court to do so. The redacted entry had been made by Police Officer Steven Levin (Levin) as part of his investigation of the accident, and the entry in issue reads: "The above officers [Wishrad and Schwartz] were at Bailey Avenue and did witness vehicle [Mr. Richardson's] one enter the Major Deegan Expressway".

Officer Levin testified at trial and, even though he stated that he interviewed Officer Schwartz and took a written statement from him, he could not testify that he received the information contained in the subject entry from either Officer Wishrad or Officer Schwartz.

Upon objection, the trial court redacted the entry as "hearsay". We agree, since to permit this hearsay statement into evidence "would be to open the floodgates for the introduction of random, irresponsible material beyond the reach of the usual tests for accuracy—cross-examination and impeachment

of the declarant" *(Matter of Leon RR,* 48 NY2d 117, 123 [1979]). Incidentally, even if the trial court had committed error in redacting this entry, we find that error would have been harmless (CPLR 2002), since this entry would not have established a prima facie case as to the City's alleged negligence. Examination of the entry at issue indicates that it does not set forth which ramp Mr. Richardson used.

We further find that, based upon the facts herein, even if Mr. Richardson had used the unsigned Service Road ramp, and there is no evidence that he did, the absence of a "Do Not Enter" sign on that Service Road ramp would not have been the proximate cause of the accident *(see, Henderberg v State of New York,* 52 AD2d 713, 714 [1976]).

It is hornbook law that liability can only attach to the City if its alleged negligence was the proximate cause of the accident *(Ventricelli v Kinney Sys. Rent A Car,* 45 NY2d 950, 951-952 [1978]; *see also, Sheehan v City of New York,* 40 NY2d 496, 501 [1976]; *Rivera v City of New York,* 11 NY2d 856, 857 [1962]).

In our opinion, overwhelming evidence was presented by the City of the fact that Mr. Richardson was in an alcoholic stupor when he entered the Expressway, and that this stupor was of such magnitude that it impaired his driving skills and prevented him from responding to the multiple warnings of danger that he received before the accident *(see, Hutchins v State of New York,* 30 AD2d 737, 738 [1968]). This evidence included:

(1) The unrefuted medical expert testimony of toxicologist Dr. Bidanset, who testified, in pertinent part: (a) that Mr. Richardson had an ethyl alcohol level of .29%; (b) that, as a result of this alcohol level, Mr. Richardson would not be able to see clearly and "recognize what was going on"; and, (c) that "at .29 percent [alcoholic concentration, Mr. Richardson was] severely intoxicated and it would adversely affect all of the skills necessary to operate a motor vehicle";

(2) The evidence shows that, regardless of which ramp Mr. Richardson used, Mr. Richardson was oblivious to the fact that these ramps were not an entrance to the Expressway;

(3) Officers Wishrad and Schwartz testified that, soon after Mr. Richardson entered the exit, they honked their car's horn and turned on a portable turret or red dome light in an attempt to get Mr. Richardson's attention before he entered the Expressway, but he ignored them, even though the officers' car was only a few feet away from Mr. Richardson's; and,

(4) Engineer Fein testified, in pertinent part, that, even after Mr. Richardson drove his car onto the Expressway, there were numerous warning signs along the Expressway that should have alerted a sober and prudent driver that he was traveling against traffic, and those warning signs were mentioned in detail *supra,* in the analysis of Mr. Fein's testimony.

We have examined the cases cited by appellants Mrs. Leyva and Mr. and Mrs. McNeil, such as *Humphrey v State of New York* (60 NY2d 742, 744 [1983]), which, in substance, hold that the decedent driver's blood alcohol level at the time of the accident could not be viewed as the intervening cause as a matter of law, and we find those cases to be inapplicable to the facts herein. In *Humphrey,* the court specifically found the State to be negligent in the manner in which it marked the road and in the construction of a barrier at the end of a dead-end section of a State highway, and further, the court found that the State's negligence was one of the proximate causes of the accident. In the case before us, no negligence was proven against the City that could, by any stretch of the imagination, be considered to be the proximate cause of the accident.

We find that "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial" *(Cohen v Hallmark Cards,* 45 NY2d 493, 499, *supra).*

We further find that the trial court erred insofar as it usurped the jury's function by reapportioning the liability, since it is the jury's duty "to determine apportionment, following the liability verdict" *(Kelly v M. C. Elec. Co.,* 68 AD2d 657, 661 [1st Dept 1979]).

Accordingly, we modify the judgment to the extent of ordering a new trial on the apportionment of the subject 10% liability among the estates of Mr. Richardson and Mr. Leyva and Drah Cab, unless the parties stipulate to the apportionment as ordered by the trial court. Concur—Murphy, P. J., Sullivan and Ross, JJ.

Carro and Fein, JJ., dissent in a memorandum by Carro, J., as follows: To conclude as a matter of law that a jury verdict is not supported by sufficient evidence a court must find that "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial." *(Cohen v Hallmark Cards,* 45 NY2d 493, 499.) That test was not met here, and the trial court, there-

fore, erred in dismissing the claims against the city as a matter of law. Accordingly, I would reinstate the verdict and thus dissent from the majority's decision.

As the majority points out, Officers Wishrad and Schwartz testified at trial that Richardson, who appeared to them to have been driving in a normal fashion, made a left turn on Van Cortlandt Park South, across double yellow lines, and entered an exit of the Major Deegan Expressway. The officers maintained that Richardson entered the westerly mouth or ramp of the exit which was marked with a "Do Not Enter" sign. It is undisputed that the other branch of the exit, the Service Road or the Bailey Avenue mouth, had no sign warning drivers not to enter. Officer Wishrad, who had testified at a deposition, was impeached as follows:

"Q Officer Wishrad, do you recall testifying at an Examination Before Trial on August 10, 1982 where you gave sworn testimony?

"A Yes, I do.

"Q Do you recall being asked these questions and giving the following answers at Page 20, line 19?

" 'QUESTION: Which mouth did you exit out of?

" 'ANSWER: I exited the service road which would be heading south.

" 'QUESTION: South on the service road?

" 'ANSWER: Yes, sir.

" 'QUESTION: That would be the exit that the Richardson vehicle entered; is that correct?

" 'ANSWER: Yes.

" 'QUESTION: Did you observe whether there were any signs or traffic control devices controlling the exit of the mouth that you exited on to the service road, right at the exit mouth itself?

" 'ANSWER: No, there were no signs that I recall.' "

The majority states that this prior testimony did not raise a factual issue of credibility on the question of which ramp Richardson entered, and it refers to other portions of Wishrad's deposition to demonstrate that his prior testimony was not inconsistent with his trial testimony. Contrary to the statement by the majority, the portions of Wishrad's deposition upon which the majority relies were never admitted into evidence at the trial and are not a part of the record on appeal. The majority relies on three statements in the record made by three different counsel which state that the deposi-

tions were read into evidence, but none of which prove that the *entire* depositions were read into evidence. For instance, at page 571, counsel for plaintiff Leyva, while arguing that there was some evidence to indicate that Richardson had entered the unsigned mouth of the exit, pointed out that the depositions "were read in at which time they [Wishrad and Schwartz] identified photographs of that exit." Obviously, Leyva's counsel was referring only to the very select portions of the depositions he had used to cross-examine Wishrad and Schwartz.

At page 620 of the record, the city's trial counsel referred during summation to testimony that the officers had given at the examination before trial. Again, this statement does not prove that the depositions were read into the record. Rather, it only shows that trial counsel for the city may have believed they were read into the record or may have been improperly referring to matters outside the record. During the summation by counsel for plaintiff McNeil, Mr. Voletsky also stated that the depositions of Wishrad and Schwartz had been read into evidence and then quoted that portion of Wishrad's prior testimony which had been used to impeach him at trial. At no point did any counsel state that the entire depositions were read into evidence, and the majority fails to cite any part of the record where the depositions were actually read into evidence in full.

In fact, on appeal, plaintiffs' attorneys objected strenuously to the respondent's use of those portions of the depositions not contained in the printed record. The city's appellate attorney, who was not trial counsel, advised this court in a letter submitted prior to oral argument that based on pages 571, 620 and 669 of the record, he had a good-faith basis for believing that the depositions were read into the record. He then, however, offered to submit a new brief without the objected-to references to the depositions. It is apparent from the conciliatory tone of this letter that respondent has recognized its error in relying on the entirety of these depositions on appeal. For this court, therefore, to consider those portions of the deposition on this appeal for any purpose is patently improper. *(Matter of Poulos v D'Elia,* 66 AD2d 820.)

Secondly, any person reading or listening to the portion of Wishrad's deposition used to impeach him at trial could reasonably infer from it that Richardson did enter the unsigned exit. Thus, a question of credibility on this crucial issue was sufficiently raised. Moreover, CPLR 3117 (a) (2) permits an adverse party to use a party-deponent's deposition as evidence-

in-chief and not merely to impeach the witness's credibility. *(Feldsberg v Nitschke,* 49 NY2d 636, 642.) In fact, this jury was so instructed. Thus, it is impossible to say that there existed "no valid line of reasoning" which could have led the jury to conclude that Richardson entered the unsigned mouth of the exit.

I also cannot adhere to this court's conclusion that even if Richardson entered the unsigned exit, the city's failure to post a "Do Not Enter" sign was not a proximate cause of the accident, since Richardson's severe alcoholic intoxication was an intervening and superseding cause as a matter of law.

First, it is unquestionable that the fact finders had a sufficient basis for determining that the city's failure to post a sign at the Bailey Avenue mouth was negligent. The majority points out that Bronx Borough Engineer Frank Piturro testified that a "Do Not Enter" sign was not necessarily needed at this exit ramp because of the double yellow lines on Van Cortlandt Park South. Therefore, it is assumed that without any other traffic signal or marking whatsoever a driver should know not to make a left turn from Van Cortlandt Park South to the unsigned exit ramp solely because of the presence of double solid lines, which merely separate the northbound and southbound flows of traffic. New York State Manual of Uniform Traffic Control Devices (Manual [17 NYCRR part 200]) § 261.5 (b), adopted pursuant to New York State Vehicle and Traffic Law § 1680, states the following: "Yellow barrier lines shall be used only between lanes of traffic flow in opposite directions or to outline areas where all traffic must pass to the right. They are basically 'no-passing' markings." *(See also,* Manual § 260.6). With reference to no-passing markings, Vehicle and Traffic Law § 1126 (b) provides that such markings do not, however, prohibit a driver from turning left to enter or leave a highway.

Marvin Specter, a consultant engineer, testified that the geometric design of the Service Road exit ramp indicated that a sign was vital. While the majority points to the fact that City Engineer Piturro testified that he felt a sign was not necessarily needed, the strength of that assertion is weakened by the fact that Piturro nevertheless made an official recommendation to place a sign there. In light of the fact that the omission in posting a sign created the danger that a person would enter the exit and travel southbound on a northbound highway, the jury could well have concluded that the city was negligent.

Whether the causal connection between the city's negli-

gence and the plaintiffs' injuries was severed by Richardson's intervening act of driving into the exit in a grossly intoxicated state depends on whether the intervening act was an extraordinary or unforeseeable consequence of the danger or risk created by the city's negligence. *(Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315.) Determining these questions of foreseeability is ordinarily a function for the fact finder, as is the question of negligence itself. *(Supra.)*

In *Derdiarian (supra),* the plaintiff was injured when the driver of a car, who had neglected to take his medication, suffered an epileptic seizure, lost consciousness and crashed through a negligently barricaded roadway construction site. Even though the driver was unconscious when he went through the improperly barricaded area, the court refused to find as a matter of law that the driver's negligence was a superseding cause which interrupted the link between the construction company's negligence in failing to safeguard the excavation site and the plaintiff's injuries. The court stated (p 316): "From the evidence in the record, the jury could have found that Felix negligently failed to safeguard the excavation site. A prime hazard associated with such dereliction is the possibility that a driver will negligently enter the work site and cause injury to a worker. That the driver was negligent, or even reckless, does not insulate Felix from liability [citations omitted]. Nor is it decisive that the driver lost control of the vehicle through a negligent failure to take medication, rather than a driving mistake [citation omitted]. The precise manner of the event need not be anticipated. The finder of fact could have concluded that the foreseeable, normal and natural result of the risk created by Felix was the injury of a worker by a car entering the improperly protected work area. An intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor negligent."

Here, the driver, Richardson, was grossly intoxicated with a .29% alcoholic content of the brain, but he was far from unconscious. Moments before entering the exit he had stopped at a red light and proceeded normally as the light turned green, thus indicating he could respond to at least some traffic signals. He then made the left turn and navigated his car along the curved road to the Major Deegan Expressway in a normal fashion. Even Dr. Bidanset, a toxicologist, agreed at trial that Richardson's ability to navigate his car in this fashion appeared inconsistent with the .29% finding, which

would normally mean that the driver would be "virtually asleep."

The majority emphasizes that Richardson's intoxication, which prevented him from responding to the many warnings of danger he received before the accident took place, which if heeded could have averted the collision, serves to sever the causal link between the city's negligence and plaintiffs' injuries. According to *Derdiarian (supra)*, however, the focus must be on whether the foreseeable and natural result of the city's negligence in failing to post a "Do Not Enter" sign is the result which occurred here, a head-on collision between a southbound and a northbound car. Obviously, the possibility of a head-on collision was the precise danger created by the city's negligence. Although *Derdiarian (supra,* at p 316) states that "[t]he precise manner of the event need not be anticipated", the city could, in any case, have anticipated that a drunken driver with impaired driving abilities could enter the negligently unsigned exit ramp and not even notice an unmarked police car behind him honking its horn and displaying a red dome light.

As to the warning signs along the highway itself, which the majority states would have alerted a sober person to his mistake, it is important to note that there was no evidence to determine whether Richardson in fact had any opportunity to notice such warning signs due to the timing of the accident, the length of the highway that he traveled, and the nature of the traffic conditions at the time. For example, it cannot be said that Richardson should have seen that the cars on the other side of the barrier were traveling in the same direction as he, when there was no evidence as to whether at 3:00 A.M. there was any traffic on the other side. Likewise, no evidence was presented that any other cars besides the taxicab were coming towards Richardson so as to alert him to the fact that he was traveling in the wrong direction. Nor does it appear that Richardson had much time to notice anything, since the testimony suggests that the impact occurred very rapidly. Officer Schwartz heard the crash while he was still on Bailey Avenue and estimated it occurred 20 seconds after Richardson first entered the exit, not the highway. Plaintiff McNeil, one of the injured taxicab passengers, described Richardson's headlight as "coming from nowhere." Yvonne Foss testified "It was so fast, it was just like that. (Whereupon the witness snaps her finger.)" The point of impact was estimated as being between 200 yards and 1,500 feet from the exit. Thus, what were described as numerous "ignored" warnings by Richard-

son after he entered the highway are really no more than speculations, which the jury was entitled to and apparently did disregard due to the reality that this accident occurred so rapidly.

In conclusion, then, it cannot be said that there was no basis in the record for the jury to conclude that Richardson entered the negligently unsigned exit ramp and that the foreseeable result of the city's negligence was that a car would enter the highway from this exit and collide with a car traveling in the opposite direction. Accordingly, Richardson's negligence was not a superseding cause relieving the city of its responsibility. The jury verdict, finding the city only 10% liable, cannot be said to be so irrational as to have merited dismissal as a matter of law. Accordingly, I would reverse the judgment and reinstate the jury verdict.