[848 NYS2d 97]

In the Matter of ALBERT MILTON K., JR., a Child Alleged to be Permanently Neglected. ST. VINCENT'S SERVICES, INC., Respondent; ALBERT MILTON K., Respondent. TAMARA STECKLER, as Law Guardian, Appellant.

First Department, December 20, 2007

## APPEARANCES OF COUNSEL

*Tamara A. Steckler, The Legal Aid Society*, New York City (*John A. Newbery* and *Brian T. Lamb* of counsel), appellant.

*Magovern & Scalfani*, New York City (*Joanna M. Roberson* and *Frederick J. Magovern* of counsel), for St. Vincent's Services, Inc. respondent.

*Neal D. Futerfas*, White Plains, for Albert Milton K., respondent.

## OPINION OF THE COURT

Saxe, J.

This appeal presents the difficult situation of a biological father who has done everything he can, and everything the agency requires and suggests, to regain custody of his child after years in foster care. May his parental rights nevertheless be terminated because the child—who has known only his kinship foster home with his great aunt—remains fearful and distrustful of him? Is the parent's ability to successfully form a close bond with the child a prerequisite to permitting a fit parent to regain custody of his child?

We affirm the Family Court's order, agreeing that the agency failed to prove by clear and convincing evidence that respondent father failed to plan for the child in the manner required by the Social Services Law. Respondent's inability to solve the complicated psychological problem of coping with the child's close bond with his foster mother and his fear and anxiety prompted by the prospect of leaving her, is not in itself a failure to plan as contemplated by the statute.

Petitioner agency commenced this proceeding pursuant to Social Services Law § 384-b, to terminate respondent's parental rights on grounds of permanent neglect. Such a result would free the child for adoption by his maternal great aunt, with whom he has resided since he was less than two years old.

The subject child was born in October 1995. He was first placed in foster care on January 29, 1997 pursuant to a child protective proceeding filed against his parents; both parents had a history of drug abuse, and respondent father was incarcer-

ated on a drug possession charge at the time. The mother died on March 8, 1997, and on March 17, 1997, respondent entered a residential drug treatment program. In April 1997, the child was first placed in the kinship foster home of his maternal great aunt, where he has remained. When the foster care placement lapsed on June 30, 1999, respondent voluntarily agreed to the continuation of the child's placement in foster care for an indefinite period of time, pursuant to Social Services Law § 384-a.

Respondent successfully completed the residential drug treatment program he enrolled in on September 3, 1997, and since then he has maintained full sobriety. Agency records from between 1998 and 2001 reported that respondent attended biweekly visits with the child and interacted appropriately with him, and that the visits went well. He completed a parenting skills program and a vocational training program. He obtained a three bedroom apartment with his fiancée, whose completion of a drug program and participation in visits with the child were also successful. Over the years in question, he was wholly cooperative with the agency's efforts to encourage and strengthen his parental relationship with his son, and did whatever was required to be reunited with the child.

Visitation began and gradually increased without incident, beginning with biweekly supervised visits, then eventually weekly unsupervised visits. In December 2001 the agency began arranging overnight visits, pursuant to a plan for a trial discharge of the child to respondent.

At that point, difficulties with visitation began to arise. The child, then six years old, told the agency caseworker that he did not like going to respondent's home, complaining that it was dark there since there was no nightlight. The agency stopped scheduling overnight visits, although the unsupervised weekly visits continued. Then, in the spring of 2002, the child indicated that he did not want to visit with his father, although he could not specify any reason. On April 10, 2002, the child informed the caseworker that he had been scared on the March 30, 2002 visit because respondent said he had shot someone. Visitation was temporarily suspended by the court, and evaluations were performed by agency professionals, and weekly family therapy sessions took place beginning in June 2002.

The agency psychologist reported that in January 2002 the child told him he did not want to go to respondent's home because it was dark and he slept by himself, adding that his foster mother had told him to be sure to impart this information.

According to the report, the child also said that the room had no nightlight; that neither respondent nor his fiancée read the child a bedtime story or tucked him in, but instead just told him to go in the room; that he was not allowed to watch television, and that neither respondent nor his fiancée played with him; and that he did not like visiting with his father, and was scared when there, although when pressed said he didn't know why.

A psychiatric evaluation on January 24, 2002 contained similar information, as well as additional particulars regarding the child's severe anxiety about losing his mommy.

The therapist who handled the family therapy sessions reported some positive results as 2002 progressed, but beginning in January 2003 the child began to become increasingly aggressive and oppositional in these sessions. The family therapy sessions came to an end in October 2003 when respondent's work schedule interfered, but weekly visits continued, at the foster home from November 2003 through February 2004, and at the agency thereafter. The tenor of the visits does not appear to have undergone much change throughout this time.

Letters from the child's individual therapist indicated that he frequently reiterated his wish to continue living with his foster mother, and his deep anxiety. In one noteworthy letter from the therapist, the child's tightly bound relationship with his foster mother is illustrated with the information that the foster mother supervised the child in his daily classes, which help his special education teacher supported, although the teacher's supervisor felt that the foster mother should "wean herself away." The child's therapist provided additional insight with a carefully worded comment that he had been "disconcerted at times when [the foster mother] has spoken openly in Albert's presence about the issues which involve [respondent]. It is difficult to assess Albert's custodial wishes with *absolute* confidence because of the strong messages which his loving [foster mother] conveys to him about matters affecting his view of custody."

A child may be determined to be permanently neglected under Social Services Law § 384-b (7) (a) when the parent fails to "plan for the future of the child . . . notwithstanding the agency's diligent efforts to encourage and strengthen the parental relationship." Planning for the future of the child is defined as "tak[ing] such steps as may be necessary to provide an adequate, stable home and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent. The plan must be realistic and feasible" (Social Services Law § 384-b [7] [c]).

The agency points to the provision of the Social Services Law stating that "[a] visit or communication by a parent with the child which is of such character as to overtly demonstrate a lack of affectionate and concerned parenthood shall not be deemed a substantial contact" (Social Services Law § 384-b [7] [b]). However, the evidence does not show that respondent failed to demonstrate his affection and concern; indeed, all the professionals involved in the case concluded that he clearly demonstrated his affection and concern. Rather, the child rejected him. This does not establish grounds for the termination of parental rights under subdivision (7) (b).

Nor is this a case in which the parent failed to overcome the problem that led to the foster care placement. Such cases, most of which involve child abuse, are therefore inapposite (*see e.g. Matter of S. Children*, 210 AD2d 175, 176 [1994], *lv denied* 85 NY2d 807 [1995]; *Matter of Sonia H.*, 177 AD2d 575, 576 [1991]; *Matter of Travis Lee G.*, 169 AD2d 769 [1991]). Rather than failing to "remedy the conditions which resulted in the removal of [the] child" (*Matter of Jennifer R.*, 29 AD3d 1005, 1006 [2006], *lv denied* 7 NY3d 717 [2006]), respondent was simply unable to successfully win the child's trust.

Nor does the evidence show that respondent's inability to do so was caused by the degree of lack of insight that would justify finding that he failed to plan for the child's return, as was the case in *Matter of Juanita H.* (245 AD2d 89 [1997], *lv denied* 91 NY2d 811 [1998]). In *Juanita H.*, the child had been initially placed in foster care following physical abuse by her mother's then-husband and pimp; the mother was also abusing drugs, and she denied any incidents of violence against herself or the child. At the time of the termination proceeding four years later, although the mother had successfully undergone drug treatment and remained sober, and had an apartment, a new job, and a new boyfriend, the child remained untrusting and frightened of her. Rather than recognizing the powerful basis for the child's fears and attempting to take action to allay them, the mother insisted that there was no problem, and that the child was simply being manipulative.

As the trial court found, the showing made here does not support blaming respondent for the child's resistance to leaving the home of his kinship foster mother; indeed, it is far from clear that the problem is due to a lack of insight on respondent's part.

Certainly, planning for the child's future includes taking into account his emotional needs as well as his physical and financial

needs (*see Matter of Leon RR.*, 48 NY2d 117, 125 [1979]). Yet, the requirement that the parent support the child's emotional needs does not justify a termination of parental rights solely on a showing that the parent failed to win over a child whose strong preference is to remain with the foster mother to whom he is tightly bound.

The Law Guardian emphasizes that respondent failed to develop a meaningful relationship with the child despite the years of visits and therapy, and the agency protests that respondent's inability to "connect" with the child is not attributable to the agency. They both blame the length of the delay caused by respondent's process of drug treatment and rehabilitation for the strength of the parent-child bond between the child and his foster mother. However, as the Family Court observed, the agency's service plan could have been better tailored to address the problems of reuniting the child with respondent, in view of the length of time the child had been with the foster mother and the nature of the child's bond with her.

We are not persuaded that in this instance the child is left in any sort of damaging "limbo" by this decision. Nor do we see any basis for the agency's final unsupported assertion that the continued "forcing" of this relationship is likely to cause continued emotional harm to the child.

Accordingly, the order of the Family Court, New York County (Susan K. Knipps, J.), entered on or about June 27, 2005, which, after a fact-finding hearing, denied petitioner agency's application to terminate respondent's parental rights and dismissed the proceeding, should be affirmed, without costs.

TOM, J.P., MAZZARELLI, NARDELLI and KAVANAGH, JJ., concur.

Order, Family Court, New York County, entered on or about June 27, 2005, affirmed, without costs.